**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| KOTHMANN ENTERPRISES, INC., | § | |
| successor by merger to | § | |
| Kothmann and Kothmann, Inc., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. H-01-2668 |
| | § | |
| v. | § | |
| | § | |
| TRINITY INDUSTRIES, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM AND ORDER**

The issues remaining in this case are the equitable defenses that the accused infringer, Trinity Industries, Inc., has asserted against the patentee, Kothmann Enterprises, Inc. (KEI). Trinity alleges that the claims of United States Patent No. 6,022,003 (the '003 Patent) and United States Patent No. 6,505,820 (the '820 Patent) are unenforceable because KEI and its predecessors engaged in inequitable conduct before the Patent and Trademark Office during the prosecution of both patents. In prior rulings, this court denied KEI's application for a preliminary injunction, construed the patent terms, and denied motions for summary judgment on the equitable defenses. (Docket Entry Nos. 62, 90, 252). This court held a bench trial on the equitable defenses in May 2005. (Docket Entry Nos. 224–26). In an opinion issued in September 2005, this court ruled on the parties' other summary judgment motions, holding that KEI owns both the '003 Patent and the '820 Patent; that the accused

devices, Trinity's MPS-350 and TRACC, do not infringe the asserted claims of the '003 Patent or the '820 Patent; and that the asserted claims of the '003 Patent and the '820 Patent are not invalid for lack of a written description or as anticipated by prior art. (Docket Entry No. 252).

Based on the record, the bench trial on the equitable defenses, the parties' posttrial briefs, and the applicable law, this court now enters findings of fact and conclusions of law on Trinity's claims of inequitable conduct and prosecution laches. This court does not find inequitable conduct as to the '003 Patent. This court finds that although KEI used information obtained from this litigation in prosecuting the '820 Patent and the '755 Application, and that KEI delayed disclosing to the Patent Office the existence of the litigation and materials from the litigation, there is not clear and convincing evidence that the delay deprived the Patent Office of material information or was the result of an intent to deceive, so as to warrant a finding of inequitable conduct that would preclude enforceability. Finally, this court does not find prosecution delay that would preclude enforceability. This court orders the parties to identify any remaining issues or submit a proposed final judgment by **January 27, 2006**.

The findings and conclusions set out below explain the results reached. A detailed description of the patents in this suit, the accused devices, and the parties' litigation history was included in this court's September 30, 2005 Memorandum and Opinion. It is repeated here only when and as necessary.

## I.  Findings of Fact

### A.  Background

The application for what issued as the '003 Patent was filed on November 7, 1994; the patent issued on February 8, 2000.[1]  On August 8, 2001,  Kothmann and Kothmann, Inc. ("KKI"), KEI's predecessor, filed this suit, alleging that Trinity's MPS-350 and TRACC devices infringed claims 6, 8, and 12 of the '003 Patent.  (Docket Entry No. 1 ¶¶ 6, 9).  The divisional application for what issued as the '820 Patent was filed on October 1, 1999.  That patent issued on January 14, 2003, subject to a terminal disclaimer.[2]  On that same date, KEI filed its first amended complaint in this lawsuit, asserting that Trinity's MPS-350 and the TRACC infringed claims 6, 8, and 12 of the '003 Patent and that the TRACC infringed claims 3, 4, 11, and 14 of the '820 Patent.[3]

In April 2002, this court held a four-day evidentiary hearing on KKI's motion for a preliminary injunction.  The parties presented evidence on infringement, validity, and enforceability.  In September 2002, shortly before this court issued its ruling, KEI filed U.S. Patent Application No. 10/236,755 ("the '755 Application") as a continuation of the '003 and '820 Patents.[4]  In September 2002, this court denied KEI's motion for a preliminary

---

[1]  The application was assigned number 08/335,153 and is referred to as the "'003 Application."

[2]  The application was assigned number 09/410,635 and is referred to as the "'820 Application."

[3]  Docket Entry No. 65.

[4]  Within two years from the grant of the original patent, a patentee may file a reissue application and attempt to enlarge the scope of the original claims to include previously disclosed but unclaimed subject matter. 35 U.S.C. § 251 (2000).  If the original claims have not issued as a patent, a patentee can file a continuation application claiming the disclosed subject matter under 35 U.S.C. § 120 (2000) (a continuation

injunction.  In detailed findings and conclusions, this court explained that KKI had not met its burden of showing a reasonable likelihood of success on the merits of its claim that the TRACC and MPS-350 infringed the asserted claims of the '003 Patent.  (Docket Entry No. 62).

In September 2003, after an evidentiary hearing, this court issued a *Markman* order construing the disputed terms of the '003 Patent and the '820 Patent.[5]  (Docket Entry No. 90). Within a few weeks, KEI filed a continuation application and claim amendments in the '755 Application, adding language to address—and change—an aspect of the *Markman* ruling unfavorable to KEI's infringement allegations in this suit, and disclosed the purpose to the examiner.  In February 2004 and again in December 2004, the patent examiner issued notices of allowance of the pending claims in the '755 Application.  The '755 Application was pending in May 2005 when this court held a bench trial on Trinity's affirmative defenses of inequitable conduct and prosecution laches.  (Docket Entry Nos. 229–31).

---

application may be filed before all applications in the chain issue).  The '755 Application was a continuation of the '003 and '820 Patents. The application for the '820 Patent was a divisional application.  Applicants can file a "divisional" application in response to a restriction requirement when the claims are directed to a different invention.  35 U.S.C. § 120.  Section 121 provides that if the PTO requires the applicant to divide the original application into separate applications, the prior application is not prior art against the divisional application. 35 U.S.C. § 121.   The Manual of Patent Examining Procedures defines a divisional application as "a later application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application." USPTO MANUAL OF PATENT EXAMINING PROCEDURE § 201.06 (2005).

[5] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

At the bench trial, this court heard testimony from Charles Rogers, a partner at Winstead, Sechrest, and Minick, P.C. who is one of KEI's trial counsel of record in this case. Rogers is a member of the patent bar who specializes in litigating rather than prosecuting patents. He testified as to his role in the prosecution of the '820 Patent Application and the '755 Application. Henry Ehrlich, a partner at the same firm who was primarily responsible for the prosecution of the '820 Patent Application and the '755 Application, also testified as to his work. Two expert witnesses, Michael Sutton and Alan Gordon, both experienced patent lawyers knowledgeable about practice before the Patent Office, opined as to whether under the custom and practice of prosecuting patents, KEI violated duties of disclosing related litigation pending during a patent prosecution. Dr. Dean Sicking, one of the inventors listed on the patents at issue, also testified as to statements made in the '003 Patent prosecution.

### B.  The Inequitable Conduct Assertions

In its posttrial brief, Trinity challenges two aspects of the prosecution of the '003 Patent. First, Trinity asserts that the applicant misrepresented that it had tested the device claimed in a prior art reference, U.S. Patent No. 4,655,434 issued to Bronstad (the "Bronstad '434 Patent"). Second, Trinity asserts that the applicant failed to disclose a separate patent application filed by Dr. Sicking pending before a different examiner. This separate patent application, which later issued as U.S. Patent No. 5,775,675 (the "Sicking '675 Patent"), was filed after the '003 Patent applicant had urged the distinction between "cutting" and "shredding" to overcome the examiner's objection based on the Bronstad prior art reference.

Trinity argues that in the '675 Patent Application, Sicking had described the Bronstad device as "cutting" a guardrail, while in the '003 Patent Application, Sicking described it as "shredding" and not "cutting."

As to the '820 Patent, Trinity asserts that KEI failed to disclose this litigation and certain information from this litigation during the prosecution of the '820 Patent. Trinity also asserts that KEI delayed in disclosing the existence of, and information from, this litigation during the '755 Application prosecution. This inequitable conduct allegation arises from what is described as a highly unusual circumstance: the simultaneous prosecution of a lawsuit alleging infringement of a parent patent (the '003 Patent) and of an application for a divisional patent (the '820 Patent). The unusual pattern continued in that before the divisional patent issued, a continuation application (the '755 Application) was filed. When the divisional patent issued, it was added to the lawsuit as the basis for additional allegations of infringement. The expanded lawsuit based on the parent and divisional patents proceeded at the same time as the prosecution of the continuation application. The witnesses agreed that it is rare for litigation over a parent patent to be pending during the prosecution of a divisional or continuation patent. Rogers acknowledged that this case presented an "unusual" overlap between litigation and patent prosecution. Both Erlich and Rogers testified that they had never encountered a similar situation. (Tr. (Rogers) 384:16–385:8). The task before this court is to apply the rules governing disclosures to the Patent Office to this unusual factual context.

KEI has responded by accusing Trinity of engaging in inequitable conduct itself, resulting in unclean hands. KEI argues that Trinity failed to tell the Patent Office about this litigation and litigation it filed against KEI's predecessors and Dr. Sicking in federal district court in the Eastern District of Texas, Beaumont Division, during the pendency of Trinity's (or its licensor's) prosecution of a patent application on an allegedly related device. In other words, KEI argues that Trinity engaged in conduct similar to the acts it alleges as inequitable when done by KEI. Trinity responds by arguing that KEI should not be able to present the evidence at all because it was not timely disclosed. Trinity also argues that the evidence is irrelevant because it concerns litigation that had a very different relationship to the patent application than the circumstances of this case. Because this court does not find inequitable conduct on the part of KEI, and because this court agrees that the circumstances involving Trinity's patent prosecution were different from the circumstances at issue here, it is unnecessary to reach the allegation that Trinity engaged in similar conduct.[6]

---

[6] The evidence as to Trinity's alleged inequitable conduct in a different patent prosecution was proffered but not admitted during the bench trial. This court finds the evidence as to Trinity's conduct is unnecessary to the resolution of the issues in this case. In addition, this court finds that the evidence proffered, but not admitted, as to Trinity's alleged failure to disclose this litigation to the Patent Office during the prosecution of the '985 Patent and the alleged failure to disclose the Beaumont litigation over the '928 Patent during the prosecution of the '735 Patent Application, is irrelevant. As both parties have argued, the analysis of whether a failure to disclose certain information from, or the existence of, pending litigation in a patent prosecution is highly fact-specific. This court finds that the factual differences between the relationship of the pending litigation and the pending patent prosecutions involved in the '820 Patent and '755 Application on the one hand, and in the '928 Patent and '735 Patent on the other, make evidence as to the latter irrelevant. The Beaumont litigation did not allege infringement or invalidity of the '735 Patent; instead, the litigation was limited to claims of infringement of the '928 Patent. The '928 Patent at issue in the Beaumont suit did not share the same specification as the '735 Patent that was prosecuted and did not claim the same priority date. KEI has emphasized the unusual facts of this case, in which infringement litigation over the parent patent is pending at the same time as the prosecution of divisional and continuation applications. No such scenario is involved in the relationship between the Beaumont litigation and Trinity's prosecution of other patents. The evidence as to Trinity's alleged inequitable conduct or unclean hands is

C.      The Standard for Inequitable Conduct

Patent applicants have a duty to prosecute patent applications in the PTO with candor, good faith, and honesty.   That duty requires applicants to disclose to the PTO: (1) information; (2) of which they are aware; (3) that is material to the examination of the application.  *Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed. Cir. 2000); *Ulead Sys., Inc. v. Lex Computer and Mgmt. Corp.*, 351 F.3d 1139 (Fed. Cir. 2003). A breach of this duty, coupled with an intent to mislead, constitutes inequitable conduct. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).  If Trinity demonstrates by clear and convincing evidence that KEI withheld information material to the patentability of the '003 and '820 Patents and did so with deceptive intent, this court must then evaluate whether, on balance, that conduct rises to the level of inequitable conduct.   "The more material the information misrepresented or withheld by the applicant, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *Li Second*, 231

---

not admitted.  As a result of this ruling, KEI's motion to clarify the exhibit list, (Docket Entry No. 232), is granted in part and denied in part.   The amended list of KEI's exhibits must distinguish between those exhibits that KEI proffered but that were not admitted.  In addition, KEI must submit the exhibits on separate compact discs, to distinguish between those that were admitted and those that were proffered but not admitted.

In a related motion, Trinity asks this court to strike all the references in KEI's posttrial brief to documents and evidence relating to the allegation that Trinity had unclean hands resulting from its own inequitable conduct in the prosecution of and litigation over different patents.  (Docket Entry No. 246).  This court has only considered those portions of the briefs relevant to resolving the inequitable conduct allegations against KEI.  The motion to strike is granted insofar as the posttrial brief refers to evidence that this court has not admitted.  The motion is otherwise denied.

F.3d at 1378.  The adjudication of an inequitable conduct claim is an equitable determination, committed to the discretion of the trial court.  *Monon Corp. v. Stoughton Trailers, Inc*., 239 F.3d 1253, 1261 (Fed. Cir. 2001).

"Materiality" is defined in the Code of Federal Regulations.  Information is material to patentability when:

> [I]t is not cumulative to information already of record or being made of record in the application, and
>
> (1) it establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or
>
> (2) it refutes, or is inconsistent with, a position the applicant takes in:
>
>> (i) Opposing an argument of unpatentability relied on by the Office, or
>>
>> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (2005).  "A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction . . . and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability." 37 C.F.R. § 1.56.  The Rule 56 standard is "a more objective standard than the reasonable examiner standard."  *Dayco Prods., Inc., v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003); *see id.* (discussing pre-1992 standard that defined information as material if "a reasonable examiner would have considered [the information] important in deciding whether to allow the patent

application"); MPEP § 2001.04 ("[Section] 1.56 has been amended to present a clearer and more objective definition of what information the Office considers material to patentability."). The Patent Rules expressly require disclosure of litigation pending during reissue or reexamination proceedings. 37 C.F.R. §§ 1.178, 1.56. No such express rule applies when, as here, litigation relating to a parent patent is pending during the prosecution of a divisional or continuation application.

The Manual of Patent Examining Procedure (MPEP) does not have the force of law, but contains instructions to examiners and provides information and interpretation. MPEP § 2001.06(c) states in relevant part, as follows:

> Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the U.S. Patent and Trademark Office. Examples of such material information include evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of "fraud," "inequitable conduct," and "violation of duty of disclosure." Another example of such material information is any assertion that is made during litigation which is contradictory to assertions made to the examiner. Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents and testimony.

MPEP § 2001.06(c).

Inequitable conduct requires not only a knowing failure to disclose material information, but also a finding of deceptive intent. *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288 (Fed. Cir. 2002). In the absence of a credible explanation, intent to deceive may be inferred from the facts and circumstances surrounding the knowing failure

to disclose material information.  *Id.* at 1289.  "When balanced against high materiality, the showing of intent can be proportionally less."  *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1381 (Fed. Cir. 2001).  "[If] withheld information is material and the patentee knew or should have known of that materiality, he or she can expect to have great difficulty in establishing subjective good faith sufficient to overcome an inference of intent to mislead."  *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1239 (Fed. Cir. 2003).

In the context of an inequitable conduct determination, the "applicant" includes anyone under a duty to disclose material information and includes: the inventor, the prosecuting attorney or agent, and anyone associated with the inventor or the assignee who is involved in the preparation or prosecution of the application.  *Molins*, 48 F.3d at 1178 n.6. A finding of inequitable conduct during the prosecution of a related patent will result in the unenforceability of an independently-prosecuted patent when the inequitable conduct had a "direct effect" or "direct relation" to the relief the patentee seeks.  *See Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990).  In cases involving related patents, courts have recognized "infectious unenforceability" when a related patent bears an immediate and necessary connection to the alleged inequitable conduct.  *See Mosaid Techs. Inc. v. Samsung Elec. Co.*, 362 F. Supp. 2d 526, 553–34 (D.N.J. 2005).

### D.      The Inequitable Conduct Allegations as to the '003 Patent

Trinity argues that during the prosecution of the '003 Patent, [7] the applicant made a misrepresentation about testing performed using components disclosed in a prior art reference, the Bronstad '434 Patent.  Trinity also argues that the applicant failed to disclose a patent application by the same inventors in which they made a statement about the Bronstad prior art reference allegedly inconsistent with the statements used to overcome the same reference during the '003 Patent prosecution.

---

[7] Independent claim 6 of the '003 Patent describes the following invention:

6.      An energy-absorption system comprising:

a terminal including an impact head;

a cutting section; and

a cutable member having an axis;

said energy-absorption terminal including one of the cutting section and cutable member;

said one of said cutting section and cutable member being positioned in the energy-absorption terminal aligned with the impact head and the other of said cutting section and cutable member;

said energy-absorbing terminal including one of the cutable member and the cutting section aligned with each other wherein the cutable member, and cutting section are forced together when the impact head of the energy-absorbing terminal is impacted by a vehicle;

said cutting section including cutting means positioned to cut said cutable member as the cutable member and cutting section are moved with respect to each other by the impact head.

(Docket Entry No. 162, Ex. 1, '003 Patent, col. 9–10).

### 1.    The Alleged Misrepresentation About Testing

In August 1995, the patent examiner issued an office action on the '003 Patent Application, rejecting claims 1 and 17 (and others) as anticipated by the Bronstad '434 Patent.  Those claims recited a "cutting means positioned to cut said guardrail."  The Bronstad '434 Patent disclosed a guardrail system in which bolts progressively move through metal tabs separating slots in the guardrail as the impact head is pushed by an impacting vehicle.  The system consists of a set of horizontally-overlapping guardrail sections with a series of closely-spaced slots.  The guardrail segments are attached by bolts extending through the slots.  When a vehicle impacts the nose of the terminal, the bolts are forced to move from one slot to the next, through the rail material between the spaced openings, in order to absorb the energy of the impacting vehicle.  (Docket Entry No. 146, Ex. 5).  During the '003 Patent prosecution, the examiner stated that the Bronstad reference disclosed a "cutting means" cutting the guardrail, as claimed in the '003 Application.  In February 1997, the applicant filed an amendment in the '003 Application to replace the claim term "guardrail" with the term "cutable member" and replace the term "guardrail system" with "energy-absorption system."  In response to the patent examiner's anticipation rejection based on the Bronstad '434 Patent, the applicant made the following argument before the PTO:

> Bronstad discloses bolts in slots which are intended to split portions between a line of holes.  Applicant does not believe, based on applicants testing, that those bolts will cut the guardrail but instead the guardrail fails by buckling.  At most, with small enough bolts, it may fracture pieces of the guardrail.  Cutting

> means is not, using ordinary language of this art, readable on
> Bronstad's bolts which are at best holding means which force
> compression and bending of the guardrail or fracturing of parts
> of it.

(D. Ex. 2, Tab. 16, T01040).  On March 17, 1997, the examiner responded as follows:

> As concerns claim 17 Bronstad discloses an energy absorbing
> system . . . . including cutting means, splice bolts 50, positioned
> to cut the cutable member as the cutable member and cutting
> section are moved with respect to each other by the impact head.

(*Id.*, Tab 17, T01058–59).  On November 10, 1997, the applicant filed its Brief on Appeal

and referred to "testing" a second time, as follows:

> Claim 17 recites cutting means positioned to cut the cutable
> member.  Bronstad discloses bolts in slots which are intended to
> split portions between a line of slots.  Applicant does not
> believe, based on applicants testing, that those bolts will cut the
> guardrail but instead the guardrail fails by buckling.  At most,
> with small enough bolts and small separating material, the
> separating material may fracture and break way.  Cutting means
> is not, when using ordinary language of this art, readable on
> Bronstad's bolts which are at best holding means which force
> compression and bending of the guardrail or fracturing parts of
> it.

(*Id.* Tab 24, T01115).

The PTO Board of Patent Appeals reversed the examiner's rejection.  The Board's

opinion stated in part as follows:

> We agree with the appellants that the claimed "cutting means"
> is not readable on the bolts. . . . In that regard, the claimed
> "cutting means" must be given its broadest reasonable
> interpretation consistent with the specification, and must be read
> in light of the specification as it would be interpreted by one of
> ordinary skill in the art.  In this case, the specification discloses
> (1) the cutters are wedge shaped, and (2) the cutters slice the rail

> [] with a "shearing" action.  In our view, an artisan would
> readily recognize the basic difference between cutting as
> disclosed in this application and the shredding disclosed by
> Bronstad. . . . [T]he claimed "cutting means" is not readable on
> the bolts [] of Bronstad since the bolts [] will shred out rail
> material, not "cut" the rail material.

(*Id.*, Tab 26, T01148–49 (internal citations removed)).

Trinity alleges that the applicant made an affirmative representation that it had tested

the device claimed in the Bronstad prior art reference and argues that Sicking's testimony

during the bench trial supports a finding that he intended to deceive the PTO.  Sicking

testified that did a test using "rounded and blunted" blades similar to the rounded bolts

disclosed in the Bronstad '434 Patent, in a guardrail that would be used in the preferred

embodiment of the invention claimed in the '003 Patent.  The guardrail he tested did not have

the slots described in the 'Bronstad '434 Patent guardrail.  (Tr., pp. 178, 181–82).  Trinity

alleges that Sicking represented to the PTO that he had performed a test using not only a

rounded piece meant to perform like Bronstad's bolts, but also a guardrail that had the type

of slots or tabs claimed by Bronstad.  Trinity argues that because claim 17 of the '003 Patent

Application recited a "cutable member" rather than a "guardrail," the "only" reasonable

interpretation of Sicking's statement about his testing is that the "guardrail" used in the test

referred to the Bronstad guardrail, and that the examiner was led to believe that the applicant

had tested  Bronstad-type bolts in a Bronstad-type guardrail.

The words used in the challenged statements, taken in context, and Sicking's

testimony as to what he did in the test he described and why he described it as he did, do not

provide clear and convincing evidence of a misrepresentation or intent to deceive.  The original application for the '003 Patent disclosed two "means" of cutting a "guardrail" and consisted of sixteen claims, including claims for a guardrail system.  In 1995, the applicants had elected to pursue only the claims directed to a guardrail system.  In the February 1997 amendment, the applicants replaced the claim term "guardrail" with the term "cutable member" and replaced the term "guardrail system" with the term "energy-absorption system."  The focus of the February 5, 1997 response to the examiner was on the rejection of claim 17.  Sicking had responded to the examiner's rejection of claim 1 by pointing out that as amended, it no longer recited "cutting means positioned to cut said guardrail," but instead "recites cutting blades with the edges facing the guardrail."  (D. Ex. 2, Tab 16, T01039). Sicking emphasized that the Bronstad '434 Patent disclosed bolts, not "cutting blades."  As to claim 17, the applicant again focused on the difference between the bolts claimed in Bronstad and the "cutting means" claimed in the '003 Patent Application.  The applicant noted that as amended, claim 17 recited "cutting means positioned to cut the cutable member."  The applicant pointed out that Bronstad "disclosed bolts in slots which are intended to split portions between a line of holes."  In the brief reference to "testing," the applicant did not describe the method or means of the test, or the specific results.  Instead, the applicant briefly stated a belief as to what the (undisclosed) results supported—that "these bolts" will not cut "the guardrail" but "instead the guardrail fails by buckling."  The applicant did not refer to bolts cutting "portions between a line of holes," which is how it had just referred to what the Bronstad reference claimed, but instead used the term "guardrail."

The point was that the claimed "cutting means" did not read on Bronstad's bolts, not that the "cutable member" did not read on the Bronstad claim of "slots separating a line of holes."

The fact that Sicking used the word "guardrail" instead of "cutable member" in referring to the inference drawn from the testing results does not show an attempt to mislead the examiner into believing that the test used a Bronstad-type of guardrail as well as Bronstad-type bolts.  The prior sentences did not use the word "guardrail" to describe either what the Bronstad '434 Patent disclosed or what claim 17 of the '003 Application disclosed. Sicking did not say that, based on his testing, he believed that the bolts would not cut the "cutable member."  Nor did Sicking say that he believed the bolts would not cut the "portions between a line of slots."  Instead, he used the general term, "the guardrail."  The '003 Patent Application used the term "guardrail" frequently to refer to the preferred embodiment of the claimed invention.  Had Sicking intended to mislead the examiner into thinking that he had tested a Bronstad-type of guardrail, he would more likely have used the same words he used to describe that guardrail in the previous sentence—"that those bolts will cut the 'portions between the line of holes'"—rather than the term "guardrail."

The reassertion of the testing reference in November 1997, after the examiner had maintained his position that as to claim 17, Bronstad's bolts anticipated the '003 Application because they were "cutting means positioned to cut the cutable member," similarly does not support Trinity's argument.  Again, the applicant compared claim 17 to Bronstad without using the word "guardrail."  Again, the applicant did not describe the testing done, but only a belief as to how the bolts would perform based on (unspecified) results of the testing.

Again, the applicant stated that based on the testing, it believed that "those bolts"—which had to be the Bronstad bolts, the only bolts described—would not "cut the guardrail."  To what does "the guardrail" refer?  Trinity correctly points out that the applicant did not use the words "cutable member," the words used in claim 17.  But neither did the applicant use the words "portions between a line of slots," the words used to describe the specific type of guardrail Bronstad claimed.  Instead, the applicant used the term frequently used in the '003 Patent Application—"guardrail"—to describe the preferred embodiment of the claimed invention.

The next page of the same appeal brief states: "Applicant believes that the guardrail of Bronstad may buckle under pressure, but could fracture the material between slots under some conditions."  As Sicking credibly testified at trial, he would not have said this so tentatively had he tested an actual Bronstad slotted guardrail.  The sentence made clear that Sicking was not reporting on the specific results of a test on a Bronstad slotted guardrail.

The language the applicant used was, admittedly, neither precise nor precisely clear.  The word "guardrail" can refer either to the preferred embodiment of the  invention claimed in the '003 Patent Application or to the specific type of slotted guardrail that Bronstad had claimed.  Textual analysis does not support Trinity's argument that the "only" reasonable interpretation is that the applicant was referring to a test on a Bronstad-type of guardrail.  To the contrary, textual analysis at most reveals that the applicant used language that was imprecise.  Sicking's explanation of what he did and why he described it as he did is credible.  This court does not find a knowing misrepresentation to the PTO.

Trinity argues that the examiner's response showed his understanding that the applicant had tested a Bronstead-type of guardrail and that Sicking's failure to respond at that point evidences an intent to mislead.  The examiner's response was imprecise as well: "[w]hether or not the configuration of Bronstad has passed the applicant's own testing, the use of cutting means within guardrail terminals as a primary energy absorbing mechanism . . . is considered previously known in the art."  (D. Ex. 2, Tab 25, T01139).  It is unclear what the examiner believed the applicant had tested.  The applicant's failure to file an additional response further describing what it had tested or describing for the first time how it had conducted the test is not evidence of an intent to deceive.  The examiner's response does not clearly signal that the examiner had understood the applicant to say that it had tested Bronstad-type bolts in a Bronstad-type of slotted guardrail.

Sicking's testimony at the bench trial was credible.  He testified that he intended to tell the examiner that the Bronstad reference did not anticipate the invention claimed in the '003 Application because the rounded bolts Bronstad disclosed would not have the effect Bronstad described in a guardrail without the slots Bronstad claimed.  He did not intend to tell the examiner that he had tested a Bronstad-type of bolt on a Bronstad-type of slotted guardrail.  Instead, he intended to tell the examiner that he had tested the Bronstad-type of bolts in a type of guardrail that would be used in an embodiment of Sicking's claimed invention, not in a Bronstad-type of slotted guardrail.  (Tr. T (Sicking) pp. 186:17–188:7). This explanation is consistent with the language used, although, as noted, that language is not precise.

19

The Federal Circuit has found inequitable conduct based on an applicant's false representation that specific experiments were performed when such representations are made in response to invalidity positions taken by the PTO. *See, e.g.*, *Hoffman-La Roche Inc. v. Promega Corp.*, 323 F.3d 1354, 1363 (Fed. Cir. 2003); *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 410 F.3d 690 (Fed. Cir. 2005).  In *Purdue*, the Federal Circuit affirmed the trial court's ruling that the patentee had committed inequitable conduct by misrepresenting that it had performed tests of its oxycodone product that showed more efficient pain control than prior art formulations.  The examiner repeatedly rejected the claims in the application as obvious in light of prior art.  In response, the applicant represented that it had discovered that its oxycodone formulation using a four-fold dosage range achieved the same clinical results as the prior art formulations using an eight-fold dosage range.  At trial, the inventor testified that he had not obtained clinical evidence of the reduced dosage range and that the statement made to the PTO was based on his "insight" and knowledge of the pharmacological properties of the various elements in the formulations.  The patentee had no clinical evidence supporting the statement when it was made or at any time before the patent issued.  The trial court found that the patentee failed to disclose material information because it made repeated statements to the PTO that it had discovered a formulation for controlling pain that was much more effective than higher dosages of prior-art formulations, but it failed to inform the PTO that the "discovery" was based solely on the inventor's "insight."  410 F.3d at 694.  On appeal to the Federal Circuit, the patentee argued that despite the absence of scientific proof for the "insight," it had not stated that it had clinically tested

the dosage ranges described, and therefore did not expressly misrepresent a material fact. The patentee also argued that the trial court erred in finding materiality because the examiner did not rely on the assertion about the four-fold dosage range results, and patentability did not depend on the presence or absence of scientific proof of a reduced dosage range. With respect to intent, the patentee argued error on the basis that it believed the assertions of more efficient pain control.

The Federal Circuit found that the trial court's findings on materiality and intent were supported by the inventors' testimony. The court explained that materiality does not require proof that the examiner relied on the statements in approving the claims. The court based the inequitable conduct finding on the patentee's failure to tell the PTO that despite express references to tests that showed that a four-fold dosage range of the claimed formulation achieved the same clinical results as an eight-fold dosage range of the prior-art formulations, in fact, no tests had been performed at all.

> In [*Hoffman LaRoche*], the patentees had erroneously stated in the written description that a procedure had been performed and presented "results" of that procedure. This court affirmed the trial court's finding of materiality, not on the ground that experimental results were required for patentability, but on the ground that patentees misrepresented the results and made reference to them during prosecution in responding to a PTO office action. Similarly, the trial court's finding in this case was not based on Purdue's failure to provide scientific proof of its "surprising discovery," but on its claim to have made a surprising medical discovery without disclosing the evidentiary basis for it, i.e., that the alleged "discovery" under these circumstances was based on insight and was without an empirical basis.

*Id.* at 700 (citations omitted).  "Information that Purdue's assertion of a four-fold dosage range was based only on [the inventor's] insight and not on experimental results was material because it was inconsistent with Purdue's statements suggesting otherwise."  *Id.* at 699.  The court stated that the requisite level of intent could be inferred from the statements, the context in which they were made, and the fact that the patentee had several opportunities to inform the PTO that it had performed no procedures that compared a reduced dosage range of the claimed formulation against a higher dosage range of the prior-art formulations, but instead continued to describe the "results" of nonexistent testing.  *Id.* at 701.

Similarly, in *Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230 (Fed. Cir. 2005), the Federal Circuit affirmed a finding of inequitable conduct based on the applicant's submission of a video to show the patentability of the claimed lens system that contained footage shot with lenses other than those claimed in the patent application.  After repeated rejections based on prior art, the applicant submitted the video "[i]n the interests of demonstrating to the Examiner the features and uniqueness of the optical system of this patent application."  *Id.* at 1233.  In response to the defendant's inequitable conduct claim, the applicant argued that the video was not material or misleading because the claimed lens was capable of producing the footage contained in the video.  The court rejected the argument, explaining that the "numerous arguments directed to materiality overlook the fact that mere submission of the video with footage shot with other than the claimed invention constituted a sufficiently material misrepresentation without regard to whether the [claimed] lens could create the same shots."  *Id.* at 1235.  The intent-to-deceive element was satisfied

because the evidence showed that the applicant submitted the video to represent the capabilities of the claimed lens, knowing that portions of the video were shot with a different lens. *Id.* at 1236.

In these cases, the representations and information conveyed were clear and precise. The courts found inequitable conduct based on the applicants' representations that they had performed experimental testing when they had not done so and that they had achieved test results that simply did not exist. In the present case, the evidence shows that the applicant did perform tests. The language used to describe what type of guardrail system was used in the testing was imprecise. The brief reference to tests is followed by an inference as to how the Bronstad rounded bolts would perform in comparison to the claimed "cutting means." The imprecise nature of the reference to the testing, and Sicking's credible testimony as to the testing he did and what he intended to convey to the patent examiner, do not support a finding of either a misrepresentation or an intent to deceive.[8] The statement about testing in the '003 Application prosecution history does not amount to inequitable conduct.

---

[8] This conclusion is bolstered by the MPEP, § 2004, ¶ 8, which instructs that no results should be represented as actual results unless they actually have been achieved and notes that misrepresentations can occur when experiments that were conducted are inaccurately reported, "e.g., an experiment is changed by leaving out one or more ingredients." MPEP § 2004, ¶ 8. Sicking did not represent actual results that he had not achieved and did not inaccurately report how he conducted experiments. Instead, he presented an inference as to how a rounded bolt would perform, based on an experiment he had conducted but had imprecisely described.

2.     *The Alleged Inconsistency between Statements in the '675 Patent Application and in the '003 Patent Application*

On April 2, 1997, Sicking filed the application for the '675 Patent, which also discloses a roadside energy-absorbing safety device.  The device claimed in that invention discloses "sequential kinking" as the energy-absorbing means of material deformation. (Docket Entry No. 162, Ex. 4) ("The impact energy is dissipated by the controlled kinking of the guardrail beams.").  The specification portion of that patent reads in part as follows:

> Another treatment is the vehicle attenuating terminal (VAT), U.S. Pat. No. 4.655,434 (Bronstad).   VATs consist of overlapped guardrail sections that have a series of closely spaced slots.  The guardrail segments are attached by bolts extending through slots.  When a vehicle impacts the end of this terminal, the bolts are forced to *tear* through the W-beam from one slot to the next.  The *W-beam segments are cut* into several long ribbons as a impacting head is decelerated.

(*Id.*, col. 1, ll. 34–41) (emphasis added).

Trinity argues that the failure to disclose the use of the word "cut" in the '675 Application to describe the Bronstad '434 Patent is inequitable conduct because it is inconsistent with statements made in the '003 Application about the Bronstad '434 prior art reference.  In the '003 Application, the applicant stated that the Bronstad bolts did not operate by "cutting" or "shearing" rail material, but by "shredding" it.  Trinity seizes on the use of the word "cut" in the '675 Application as an admission that the blunt bolts in the Bronstad '434 Patent "cut" the segments between the slots of the Bronstad guardrail. Trinity's argument is unpersuasive.  It ignores the sentence immediately before the sentence containing the word "cut."  That sentence states, "[w]hen a vehicle impacts the end of this

terminal, the bolts are forced to tear through the W-beam from one slot to the next." The word "tear" is consistent with the position the applicant took in the prosecution of the '003 Application, that the Bronstad bolt did not shear or cut, but rather shredded, the material between the slots. The challenged sentence then describes what happens to the material between the slots after the bolts "tear through" the beam. That material is "cut into several long ribbons as an impacting vehicle is decelerated." In the context of the prior statement that the bolts "tear through" the material separating the slots, this is not an admission that the material is sliced or sheared as opposed to shredded, which would have been inconsistent with the position taken in the prosecution of the '003 Patent Application.

The description of the Bronstad '434 Patent is virtually identical to descriptions that were in other Sicking patents disclosed to the examiner during the prosecution of the '003 Patent. In the Sicking '366 Patent, the Sicking '928 Patent, and the Sicking '016 Patent, directed to different guardrail terminals, there is a description of the Bronstad '434 prior art. That description is set out below, with the differences between it and the description contained in the Sicking '675 Patent italicized:

> The guardrail segments are attached by bolts extending through slots. When a vehicle impacts the end of this *barrier* [rather than "terminal,"], the bolts are forced to tear through the W-beam from one slot to the next. *As a result*, the W-beam segments are cut into several long ribbons as a impacting head is decelerated.

The only relevant difference between the description of the Bronstad '434 Patent in the Sicking '675 Patent—which was not provided to the examiner during the prosecution of

the '003 Patent—and the description in the three other Sicking patents—which were provided to the examiner—is the absence of the words "as a result."  Sicking testified that he did not know why these three words were deleted from the description; his only explanation is that a different attorney wrote the descriptions.  The salient question is whether the absence of those three words is a relevant difference.  The answer to that question is "no."

The description of the device claimed in the Bronstad '434 Patent contained in the Sicking '675 Patent was cumulative to information already before the examiner considering the '003 Patent Application, because it is so similar to the descriptions contained in three other Sicking patents that were disclosed.  The description is consistent with the position the applicant took in opposing the examiner's arguments that the Bronstad '434 Patent anticipated the '003 Patent Application or in asserting arguments in favor of patentability. Additionally, the '675 Patent was disclosed in the prosecution of the '820 Patent Application and was not considered material.  Given the disclosure of the three other Sicking patents with very similar language describing the Bronstad prior art reference, and given Sicking's credible testimony as to the reason for the slight variation between that language and the language in the '675 Patent, there is no basis to find that Sicking's failure to disclose the '675 Patent description of the Bronstad '434 Patent was material or intended to deceive.  This allegation does not provide a basis to find inequitable conduct as to the '003 Patent.

### D.     The Allegations of Inequitable Conduct in the '820 Patent Prosecution

Trinity alleges that KEI's failure to inform the Patent Office of the existence of this litigation "in verifiable form" between August 8, 2001 and June 5, 2003, amounts to a failure to disclose material information under circumstances that show an intent to deceive.  Trinity alleges that in addition to KEI's failure to give written notice to the Patent Office of the existence of the litigation while the '820 Patent Application was pending, KEI also failed to disclose or provide certain materials from the litigation that were material to the examiner's consideration of the '820 Patent Application.  Trinity points to KEI's delay in disclosing the litigation and in submitting materials from the litigation in the '755 Application as evidence of a violation of the disclosure obligation and of an intent to deceive.

KEI responds by denying that it breached any duty to disclose material information.  KEI asserts that in addition to believing that the Patent Office had the statutory notice filed by the Clerk's Office of this litigation, Erlich gave oral notice of the litigation to the examiner in September 2001.  KEI further argues that it disclosed all material information it learned as a result of the litigation to the Patent Office in a timely fashion.  KEI uses the record as to the '755 Application to argue that the fact that the examiner issued a third notice of allowance of the claims after receiving many of the filings from this litigation evidences that the filings were not material.

### 1.     The Dispute as to the Legal Standard

The parties dispute whether the effect of section 2001.6(c) of the MPEP is to make the existence of litigation involving "the subject matter for which a patent is being sought"

material as a matter of law.  Trinity argues that the MPEP establishes the duty to disclose this litigation and makes that information material.  KEI asserts that Rule 56, not the MPEP, controls the materiality determination.

The MPEP does not have the force of law or of the rules that govern patent litigation, but is "entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith."  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 n.10 (quoting *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439)).  The MPEP states that the "existence of litigation" is material information in a prosecution of a patent involving the same "subject matter," but does not state that all the litigation materials are material.  The MPEP states that when the "subject matter" of a patent (or a patent that is sought) is involved in litigation, the existence of the litigation "and *any other* material information arising therefrom must be brought to the attention of the [PTO]."  MPEP § 2001.06(c) (emphasis added).  Courts have interpreted this language as meaning that the existence of litigation involving the same subject matter as a patent being prosecuted is "material" information.  *See DaimlerChrysler AG v. Fueling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054, 1063 (S.D. Cal. 2003); *ICU Med., Inc. v. B. Braun Med., Inc.*, No. 01-3202, 2005 WL 588341 (N.D. Cal. Mar. 14, 2006).  This  statement is, however, far from equating a failure to disclose that information to a finding of a breach of the duty of disclosure with intent to deceive.  And this statement does not mean that all information or submissions filed in litigation are "material."

A recent case involving inequitable conduct allegations arising from a failure to disclose litigation or litigation materials (that did not involve a reissue proceeding) is helpful

because of the approach the Federal Circuit followed, although the opinion is unpublished. In *Mallinckrodt, Inc. v. Masimo Corp.*, No. 04-1495, 2005 WL 2139867 (Fed. Cir. Sept. 7, 2005), the district court, then the Federal Circuit, examined allegations of inequitable conduct for failure to disclose related litigation during a patent prosecution under Rule 56. The courts analyzed whether the failure to disclose the existence of the patent infringement litigation and materials from that litigation during the prosecution of a patent application involving the same subject matter withheld information material to patentability, looking to Rule 56 for the definition of materiality. The courts then determined whether the failure to disclose the information was done with deceptive intent. Finally, the courts examined whether the conduct rose to the level of inequitable conduct. Neither the district court nor the Federal Circuit simply equated the failure to disclose the existence of related litigation or specific materials from that litigation to a breach of the disclosure duty. Instead, the courts analyzed the relationship between the patent involved in the litigation and the patent prosecuted before the Patent Office to determine whether the applicant failed to disclose information that was material under Rule 56 and, if so, the degree of materiality. That required an analysis of the extent to which the pending litigation affected the patentability of the invention claimed in the copending application. The degree of materiality in turn informed the analysis of whether the failure to disclose was accompanied by deceptive intent.

In *Mallinckrodt*, the Federal Circuit used the MPEP only to confirm the conclusion as to the materiality of undisclosed information reached by applying Rule 56. In applying the MPEP, the court did not merely examine whether the patent-in-suit and the patent-in-

prosecution involved similar claimed inventions, but specifically analyzed the claim terms at issue in both the litigation and the patent prosecution to see whether and how the litigation affected the patentability of the invention claimed in the application. The court then conducted a balancing test to determine whether inequitable conduct had occurred. *Mallinckrodt*, 2005 WL 2139867, at **15–17. This approach is consistent with Rule 56 and the relationship of that rule with section 2001.06 of the MPEP.[9]

---

[9] *See also Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997) (patentee's failure to disclose prior art patent and fact that patentee's patent was the subject of infringement litigation at the time patentee obtained reissue patent was inequitable conduct because both the prior art patent and the infringement litigation were material to patentability and was withheld with deceptive intent); *ICU Med.*, 2005 WL 588341, at *15–16 (ICU's significant incentive to hide litigation from the PTO examiner and ICU's repeated objections to Braun's motion to compel production of pending ICU patent applications, which precluded Braun from informing the patent examiner of the pending litigation, provided sufficient evidence to infer a potential intent to deceive and to sustain an inequitable conduct claim; materiality of related patent litigation was "obvious" when it challenged both the validity and enforceability of the subject matter of the pending patent application); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 676 (D. Del. 2004) (court opinion in patent litigation was not material to the patentability of pending patent when it "was preliminary in nature since it was issued pursuant to [the patent owner]'s motion for a preliminary injunction," and did not directly address the anticipatory effects of the earlier patent; plaintiff's failure to disclose summary judgment briefs, expert report, and a declaration about invalidity from the prior litigation was not inequitable conduct because the PTO was notified about the litigation and offered the defendant's arguments in other communications); *Jackson v. Vtech Telecomm. Ltd.*, 289 F. Supp. 2d 969, 985 (N.D. Ill. 2003) (patent owner's failure to disclose a prior art inventor's deposition testimony and exhibits was material in reexamination proceeding); *DaimlerChrysler AG v. Fueling Advanced Techs.*, 276 F. Supp. 2d 1054, 1063 (S.D. Cal. 2003) (inventor and his attorneys engaged in inequitable conduct when they failed to inform patent examiner that they had brought suit claiming infringement of patent from which patent applications were derived, and then settled suit to avoid possible adverse result); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 68 F. Supp. 2d 508 (D.N.J. 1999) (oral disclosure of prior litigation was sufficient, but failure to disclose defendant's arguments in that litigation, its expert's opinions, and the court's opinion was material and done with deceptive intent); *Environ Prods., Inc. v. Total Containment, Inc.*, No. 95-4467, 1997 WL 364464 (E.D. Pa. June 19, 1997) (plaintiff's failure to disclose existence of prior litigation and its own reply brief in that litigation—which contradicted its position in the pending patent litigation—was material, but court did not believe that intent to deceive was appropriate for summary judgment); *Haney v. Timesavers, Inc.*, 900 F. Supp. 1378, 1382 (D. Or. 1995) (patentee did not engage in inequitable conduct by failing to inform patent examiner about material information from prior litigation involving its earlier patents because Patent Office knew about existence of prior litigation); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.*, 837 F. Supp. 1444, 1477 (N.D. Ind. 1992) (court held that "[i]t is the 'material information' and not the mere existence of a lawsuit that needs to be brought to the attention of the examiner with regard to related litigation. . . such as supporting test data, prior art, . . . . [a]ny assertion that is made by a litigant, [] during litigation, which is contradictory to the assertions made [] to the patent examiner," and

2.     *The Evidence as to When and What KEI Disclosed to the PTO During the Prosecution of the '820 Patent Application*

A necessary first step in determining if there was a failure to disclose material information with the intent to deceive the examiner is to determine the timing and content of KEI's specific disclosures to the PTO and the relationship of those disclosures to this litigation.

In August 1995, the patent examiner considering the '003 Patent Application required the applicant to select one of four groups of claims that had been presented in the application filed in November 1994.  The applicant elected to continue the examination of claims 1–5, which were directed to a guardrail system.  The applicant later asked that the withdrawn claims, 6–16, remain for a later divisional application.  On July 20, 1999, the PTO issued a notice of allowance on claims 17, 20, and 24, which later became the patent claims asserted in this infringement case.  As issued, the claims described "[a]n energy-absorption system comprising: a terminal including an impact head; a cutting section; and a cutable member having an axis," in which the cutting section included a "cutting means positioned to cut said cutable member as the cutable member and cutting section are moved with respect to each other by the impact head."

---

patent holder's failure to disclose such material information violated the duty of disclosure).

On October 1, 1999, the application for the '820 Patent was filed in the PTO as a divisional application of the '003 Patent.  If the applicant had waited three more months to file the divisional application, it would have been considered a reissue application, subject to rules targeted to reissue applications.  The '820 Application was, however, a divisional application.  It reasserted the claims originally filed in the '003 Patent Application that were withdrawn in response to the patent examiner's 1995 restriction requirement.  The '820 Application had the same specification as the '003 Patent Application.  As originally filed, the "cutting means" limitation of the '820 Application claims was in means-plus-function format.

In January 2000, the patent examiner provisionally rejected certain claims in the '820 Application on the basis of "double patenting" and of anticipation in light of the Bronstad '434 Patent.  In February 2000, the '003 Patent issued.  In August 2000, after amendments were filed in the '820 Application, the examiner issued a  rejection for all but two claims as anticipated by the Bronstad '434 Patent and as obvious in view of the Bronstad Patent and the Sicking '366 Patent.  These were the same prior art references the patent examiner had cited during the '003 Patent prosecution.  In April 2001, the examiner allowed the two claims of the '820 Patent Application.

On September 7, 2000, the patent attorney then prosecuting the '820 Patent filed a request for continued examination, an amendment, and a terminal disclaimer voluntarily relinquishing any part of the term of the '820 Patent that would extend past the expiration of the '003 Patent.  (Docket Entry No. 141, Ex. 10).  The applicant stated that it would cancel the rejected claims to pursue them in a continuation application.

In September 2000, the UNL Board of Regents assigned the '003 Patent and the '820 Patent Application to ISC.  After the assignment to ISC, Henry Ehrlich, a lawyer with Winstead, Sechrest, & Minick P.C. and a member of the patent bar specializing in patent prosecution work, took over as the lawyer prosecuting the '820 Patent Application.  In February 2001, the applicant filed a continuation application with an amendment putting claim 12—which eventually became '820 Patent claim 1—into independent form.  The claim continued to recite a "means for cutting" along with a cutter holding section and a hollow receiving section.

On August 8, 2001, KKI filed its original complaint and preliminary injunction application in this suit, asserting that Trinity's MPS-350 and TRACC infringed the '003 Patent.  On August 29, 2001, Trinity filed its original answer and opposition to the motion for a preliminary injunction.  That same day, Ehrlich filed an amendment in the '820 Patent Application, leaving claims 12 and 13, which recited the "terminal" and "means for cutting the guardrail" limitations.  The applicants made no disclosure of the existence of the infringement lawsuit.  The Office of the Clerk of Court of the Southern District of Texas apparently did give the routine notice to the PTO of an infringement action involving the

'003 Patent, required under 35 U.S.C. § 290.[10]  The Clerk's Office did not give notice when the '820 Patent issued and allegations that it was infringed were added to this litigation.[11] Whether or not the Clerk's Office complied is irrelevant, however; the law is clear that the litigants' duty of disclosure is separate from, and is not satisfied by, a report made under section 290. The duties imposed by 37 C.F.R. § 1.56(a) and MPEP § 2001.06(c) cannot be supplanted by the general administrative notice required by section 290. The MPEP imposes on the patent applicant an independent duty to disclose the existence of related patent infringement litigation.  "[A]n applicant cannot assume that an examiner, however diligent and well-informed, will be aware of Section 290 notices in other patents.  To do so would effectively eviscerate the duty of disclosure regarding related litigation owed to each patent examiner." *ICU Med.*, 2005 WL 588341, at *14.

On September 24, 2001, Trinity filed a response to KEI's motion for a preliminary injunction in this lawsuit.  In the response, Trinity asserted that the '003 Patent was invalid

---

[10]  Section 290 provides:
The clerks of the courts of the United States, within one month after the filing of an action under this title shall give notice thereof in writing to the Director, setting forth so far as known the names and addresses of the parties, name of the inventor, and the designating number of the patent upon which the action has been brought.  If any other patent is subsequently included in the action he shall give like notice thereof.  Within one month after the decision is rendered or a judgment issued the clerk of the court shall give notice thereof to the Director.  The Director shall, on receipt of such notices, enter the same in the file of such patent.

35 U.S.C. § 290.

[11]  When the lack of such notice came to this court's attention in May 2005, inquiry revealed that the Clerk's Office provides notice to the Patent Office when a suit was initially filed, but if a pending suit is amended to add a claim of infringement under a different patent, notice of that claim would not be provided under section 290.  The Clerk's Office has since corrected the gap in its approach to the section 290 reporting obligation.

34

on the basis of three prior art patents: U.S. Patent No. 3,777,591 issued to Rands (the "Rands '591 Patent"); U.S. Patent No. 3,782,505 issued to Armstrong (the "Armstrong '505 Patent"); and U.S. Patent No. 3,428,150 issued to Muspratt (the "Muspratt '150 Patent").   Erlich testified at the bench trial that after receiving information about Trinity's response, he decided that KEI would file a continuation application and IDS in the '820 Patent Application to disclose the prior art that Trinity had cited.   Erlich testified that he telephoned the examiner to explain why he would be taking the unusual step in a divisional application of asking the examiner to consider all the claims—even the two claims previously allowed in the April 2001 office action—in light of additional prior art references.   Erlich testified that as part of the explanation he gave the examiner, he reported that the parent patent to the '820 Patent Application was in litigation and that he had learned of new prior art references in the litigation.  (Tr. (Erlich) 323:13–324:5).   Although Erlich testified that he often made a written record of telephone calls to examiners, he did not do so in that instance.   Erlich explained that his practice is to make a written record of telephone calls to an examiner that relate to changes to pending claims during a patent prosecution.  (Tr. (Erlich) 273:14–19). The telephone conversation he had about the '003 Patent infringement litigation, according to Erlich, dealt with the continuation application that asked the examiner to look at the claims—including previously-allowed claims—in light of newly-disclosed prior art references.

Rogers also testified that he understood that the Patent Office had been orally informed of the litigation well before any written notice was filed.   Rogers testified that

toward the end of 2001, he made sure that the patent office was made aware of the litigation during telephone conversations with Ehrlich, not because the litigation was "material," but to explain where the additional, previously-undisclosed prior art was "coming from." (*Id.*, p. 396: 1–7).

Erlich and Rogers both testified as to the relationship of their work on the prosecution and litigation, respectively.  Erlich had primary responsibility for the prosecution of the '820 and '755 Applications.  Rogers's focus was on the litigation, but he coordinated the litigation and the prosecution to make sure that KEI was taking consistent positions in both proceedings. (Tr. (Rogers) 416:2–11). Rogers was not listed as a prosecuting attorney on the '820 Patent Application, but reviewed and drafted the claim correspondence and the amendments that Ehrlich submitted to the PTO.  Rogers explained that he and Ehrlich "worked hard . . . because we had the litigation going on at the same time as the patent application process, we worked hard to make sure there was nothing that could even be misconstrued as being inconsistent statements." (*Id.*, p. 416: 7–10).  Rogers was also responsible for advising Erlich of information learned in the litigation that was material to the prosecution of the '820 Patent Application and, later, the '755 Application.  (Tr. (Erlich) 283:9–14).  Erlich testified that he was aware of the hearings in this case and this court's rulings during the prosecution of the '820 Patent and '755 Application, but did not actually read any documents from this litigation.  Neither Rogers nor Erlich discussed the claims in the '820 Patent Application with Sicking or Pfeifer, the inventors of the '003 Patent who were also listed on the '820 Patent Application.

In the December 2001 filing, Erlich did not disclose the existence of the litigation in writing.  On the same date, he filed an Information Disclosure Statement ("IDS"), disclosing eleven prior art references, including the Rands '591 Patent, the Muspratt '150 Patent, and the Armstrong '505 Patent that Trinity had asserted as invalidating prior art in the '003 Patent infringement litigation.  Erlich also filed an amendment to change the means-plus-function limitation of a "means for cutting" to the structural limitation of a "cutter" and to delete the "terminal" limitation—both of which were present in the '003 Patent claims—from the claims of the '820 Patent Application.  Trinity had asserted in this litigation that the "cutting means" limitation of the '003 Patent claims was not present in either the MPS-350 or the TRACC and that the "terminal" limitation of the '003 Patent meant that devices such as the MPS-350, which attach to the back of work trucks, did not infringe.  Ehrlich  testified about the December 2001 amendments, explaining that he amended the preamble of the claims from "guardrail terminal" to "energy absorption system" and as a result, he had to describe the "cutting section" in greater detail.  He explained that he did not believe that "guardrail terminal" covered all of the embodiments that had been disclosed in the '820 Application. (*Id.* (Erlich), p. 331, ll. 4–7, 21–25).  Erlich testified that it was his practice to avoid "means-plus-function" language and that he ordinarily would have changed the means-plus-function language in the '820 Application. He and Rogers both acknowledged that they used information gathered from Trinity's filings in this infringement suit in amending the '820 Patent Application claims to delete the "means-plus-function" language,  to change "cutting means" to "cutter," and to delete the "terminal" limitation from the claims.  Rogers testified

that when Trinity raised "narrowing interpretations" of the '003 Patent claims, he  revised the claims in the pending '820 Patent Application to broaden them to attempt to capture more of the originally-disclosed but unclaimed subject matter.  "[I]n part through [Trinity's] assertions in this case, we could figure out what those arguments would be that we had not fully claimed the full scope of the invention."  (Tr. (Rogers) 540: 16–25).  In December 2001, when Erlich filed the continuation application, the IDS with the prior art references, and the amendments to the claims of the '820 Patent Application, he did not disclose this '003 Patent infringement litigation in writing, despite the fact that the source of the Rands, Muspratt, and Armstrong prior art references was Trinity's submissions in this litigation and despite the fact that the change from "cutting means" to "cutter" and the deletion of the "terminal" limitation from the claims resulted in part from information obtained from Trinity's filings in the litigation.  (Tr. (Erlich) 330:20–331:4; Tr. (Rogers) 528:2–4).

This court held a four-day evidentiary hearing on the preliminary injunction application in April 2002.  In that hearing, Trinity presented evidence supporting the arguments that the "cutting means" and "terminal" limitations in the asserted '003 Patent claims meant that the MPS-350 and the TRACC did not infringe.  By the time of the preliminary injunction hearing, KEI had amended the '820 Patent Application claims to delete the "cutting means" and "terminal" limitations.  Before the hearing, Trinity had cited the Gertz '484 Patent as potentially invalidating prior art and argued that the applicant's failure to disclose it during prosecution of the '003 Patent had violated the duty of disclosure. Bronstad testified at the preliminary injunction hearing that the Gertz '484 prior art reference

anticipated all the elements of the '003 Patent.  Trinity argues that KEI should have provided the examiner considering the '820 Patent Application with Bronstad's testimony about the anticipation of the '003 Patent by the Gertz prior art reference.  Trinity also argues that KEI should have disclosed Trinity's allegations that the '003 Patent claims were invalid as anticipated and as obvious and that KEI had engaged in inequitable conduct with respect to the '003 Patent.  KEI responds that the testimony of Bronstad and the allegations of inequitable conduct as to the '003 Patent prosecution were not material to the patentability of the '820 Patent.

On July 17, 2002, Ehrlich filed a request for continued examination of the '820 Patent Application, a terminal disclaimer, and an IDS; submitted arguments to the examiner, and made several amendments to the claims of the '820 Patent Application.  "Cutter" was changed to "angled cutter" and "cuttable member" was changed to "elongated cuttable member."  Several of the new independent claims that had been added on December 11, 2001 were deleted and some of the dependent claims were rewritten in independent form.  The IDS disclosed the Gertz '484 Patent prior art reference.  In response to the examiner's rejection of claims 24–29 as anticipated by the Bronstad '434 Patent, the applicant argued that the arguments KEI presented to the examiner to overcome an earlier rejection of the '820 Patent Application claims focused on the examiner's rejection on the basis of the Bronstad '434 prior art reference:

> Applicants again submit that Examiner has failed to provide a *prima facie* showing of anticipation by Bronstad.  Applicants further submit that Bronstad does not anticipate Applicants'

claimed invention.  Applicants respectfully direct Examiner to the decision of the United States Patent and Trademark Office Board of Patent Appeals and Interferences regarding Bronstad and the parent application and patent in this case, Appeal No. 98-1461; Application No. 08/335,153 [which became the '003 Patent].  Examiner is respectfully reminded that Bronstad does not disclose the "cutting means" claimed in the parent application and patent.  Applicants therefore submit that Bronstad likewise does not disclose a "cutter" as suggested by Examiner.  It is therefore respectfully requested that Examiner withdraw the outstanding rejection.

(D. Ex. 4, Tab 19, T02172).  In response, the examiner did withdraw his objections.  On August 1, 2002, the examiner issued a Notice of Allowance on the '820 Patent Application claims.  Trinity asserts that when KEI filed its July 2002 response to the examiner's rejection, if not earlier, KEI should also have disclosed Bronstad's testimony in the preliminary injunction hearing as to why the Gertz reference anticipated the '003 Patent claims; KEI disputes that such information was material to the patentability of the '820 Patent.

On September 6, 2002, KEI filed the '755 Application as a continuation of the '003 Patent and '820 Patent Application, listing Sicking and Pfeifer as inventors.  The claims in the '755 Application include claims substantially identical to the asserted claims of the '820 Patent.  Neither Sicking nor Pfeifer knew of, or was involved in, the drafting or prosecution of the '755 Application.  When the '755 Application was filed with the PTO, KEI did not accompany it with a disclosure of this lawsuit or information about it.

On September 20, 2002, in the '003 Patent litigation, this court issued a lengthy opinion denying KEI's application for a preliminary injunction, finding that KEI had failed to show a substantial likelihood of succeeding on the merits of its claim that Trinity's MPS-

350 and TRACC products included the "cutting means" limitation in independent claim 6 of the '003 Patent.  (Docket Entry No. 62 ).  That limitation was not included in the '820 Patent claims or in the '755 Application claims.

On December 5, 2002, the patent examiner issued an office action in the '755 Application, rejecting the claims on the basis of double patenting over the '003 Patent.  On January 14, 2003, the PTO issued the '820 Patent to KEI.[12]  That same day, KEI filed its first

_____

[12]  Independent claim 3 of the '820 Patent reads as follows:

An energy-absorption system for positioning along a roadway to absorb the energy of an errant vehicle, the energy-absorption system comprising:

an impact head;

an angled cutter; and

an elongated cuttable member horizontally mounted between two parallel guardrails;

wherein the energy absorption system is positionable along a roadway to cooperate with the upstream portion of a roadside hazard; and

wherein the impact head is in operational connection with the cutter and the cuttable member such that the impact of an errant vehicle with the impact head will cause the cutter to cut at least a portion of the cuttable member to absorb the impact energy of the errant vehicle.

( Id., '820 Patent, col. 9, ll. 22–42; D.Ex. 4, Tab 17, T02150).

Independent claim 14 requires:

An energy-absorption system for positioning along a roadway to absorb the energy of an errant vehicle, the energy-absorption system comprising:

an impact head;

an angled cutter;

two parallel guardrails, each of which is constructed of overlapping guardrail sections; and

amended complaint in this lawsuit, asserting that Trinity's TRACC product infringed certain claims of the '820 Patent.  (Docket Entry No. 65).   In February 2003, Trinity filed its amended answer and counterclaims, asserting affirmative defenses of prosecution laches and inequitable conduct based on KEI's failure to disclose litigation information to the patent examiner during the '820 Patent prosecution.  Trinity cited section 2001.06(c) of the MPEP in support of its inequitable conduct allegations.  In the bench trial, Rogers testified that although he researched regulations that might bear on whether he was required to disclose the '003 Patent litigation during the '820 Application prosecution and knew about section 290 and the duty of candor under Rule 56, he did not think about the MPEP section on

----

> an elongated cuttable member mounted horizontally between the two parallel guardrails;
>
> wherein the energy absorption system is positionable along a roadway to cooperate with the upstream portion of a roadside hazard; and
>
> wherein the impact head is in operational connection with the cutter and the cuttable member such that the impact of an errant vehicle with the impact head will cause the cutter ti cut at least a portion of the cuttable member to absorb the impact energy of the errant vehicle.

(*Id*. at col. 10, ll. 11–28; D. Ex. 4, Tab 19, T02170).

Following the *Markman* hearing, this court construed the disputed terms of the '820 Patent, as follows:

> An "angled cutter" is an angled structure that cuts, wherein "angled" means that at least one edge of the angled structure is oriented other than perpendicular to the material to be cut.
>
> The limitation "an elongated cuttable member horizontally mounted between two parallel guardrails" means that the "elongated cuttable member" must be horizontally mounted in the space that separates two parallel guardrails.

(Docket Entry No. 90, pp.55–58).

disclosing litigation until February 2003, when Trinity filed its first amended counterclaim. Erlich similarly testified that he was unaware of MPEP § 2001.06(c) until KEI cited it in the amended counterclaim filed in February 2003.

In June 2003, KEI filed an amendment in the '755 Application and, at the same time, provided written notice of the existence of this litigation to the PTO.  This was the first written notice of the existence of the litigation given to the PTO.

In August 2003, this court held a *Markman* hearing and issued a claim construction order in early September.  The focus of the *Markman* order was on the claim term "terminal" in the '003 Patent (which is not in the '820 Patent); on the term "angled cutter" in the '820 Patent (which is not in the '003 Patent); and on the words "horizontally mounted between" in the claim term "an elongated cuttable member horizontally mounted between two parallel guardrails."  This last term is not in the asserted claims of the '003 Patent. This court construed "between" to mean "in the space that separates," which precluded a cuttable member mounted above or below two parallel guardrails when viewed from the side.

In October 2003, the applicant filed a request for continued examination and amendment in the '755 Application, adding new claims.  As amended, the pending claims in the '755 Application included claims substantially identical to the asserted claims of the '820 Patent with the exception of a broadening amendment reciting:

> an elongated cuttable member horizontally mounted between (when viewed from above) two parallel guardrails.

The applicant explicitly stated that the broadening amendment was intended to address and change the part of the *Markman* ruling that interpreted the limitation of "'an elongated cuttable member horizontally mounted between the two parallel guardrails' to mean that the 'elongated cuttable member' must be horizontally mounted in the space that separates two parallel guardrails.'"  The applicant submitted new claims tracking the language of claims 3 and 14 of the '820 Patent, including related dependent claims, to add the words "when viewed from above" in a parenthetical to modify the "between" language of these claims, to change the *Markman* order and to try to capture Trinity's TRACC.  The applicant also stated that it would be filing an IDS to submit litigation materials, including this court's *Markman* order, but the IDS was not filed until December 24, 2003.  In the "remarks" accompanying the October 2003 request for continued examination, the applicant stated that it "does not necessarily assert that any specific information from the ongoing litigation is material to the examination of the current Application," but "submits this information out of an abundance of caution because the adverse party in the litigation has accused Applicant of inequitable conduct based on an assertion that the Applicant should have provided certain information to the Examiner during the prosecution of the ['820 Patent]."

Ehrlich testified that Rogers authored the "when viewed from above" limitation to change the outcome of the *Markman* order, to try to capture Trinity's TRACC and make it infringe.  KEI filed the amendment adding this limitation after disclosing, but before filing, this court's *Markman* order.  Ehrlich had never been involved in a patent prosecution or read

about a patent prosecution in which an amendment was made specifically to address a *Markman* order.  (Tr. (Ehrlich) 350:1–17).

In December 2003, the applicant did submit an IDS in the '755 Application containing the promised litigation materials, but that IDS apparently was lost in the PTO and did not reach the examiner.  In February 2004, the patent examiner issued a notice of allowance of the pending claims in the '755 Application, noting that no IDS had been received.  Rogers testified that there were telephone conversations with the PTO about the lost documents, although no statements appear in the file history.  Rogers explained the sequence of events and the reason he did not file the litigation materials until December 2003 in the first place, as follows:

> Rogers:   I had to spend an inordinate amount of time reviewing these documents to make sure that we weren't going to be faced with further allegations of violations of the protective order. . . . At that stage I believe we received a notice of allowance, but the patent office had lost all of the box of documents we had submitted in on December 24th.

> Counsel:   [What is] the basis of your belief that the patent office had lost all of the boxes?

> Rogers:   Because the examiner who receives our RCE that had the disclosure of litigation, disclosure of all the specifics, even including the index referencing the box of documents, issued, after seeing that, knowing that the documents were coming from the litigation, he issued a notice of allowance confirming that he didn't want to see them in the first place. . . . [The examiner] made a comment in the [Notice of Allowance], and he underlined it.  I believe he was frustrated with the office losing these documents because we told him that they were coming. He says, "No IDS has been received." So he's issuing the notice of allowance.  He's telling us that he did not get the documents that he expected.

(*Id.* (Rogers) 505:22–06:13).

After receiving this notice, KEI filed a continuation application and an IDS in March 2004.  The IDS included the boxes of litigation materials.  The continuation application did not, however, include any new or amended claims.  In December 2004, the patent examiner again issued a notice of allowance for the '755 Application claims.  In this third notice of allowance, the examiner stated that this "communication is responsive to the RCE of 10/21/04 [sic, 10/21/03]; the TD of 6/27/03; and the deceision [sic, decision] of the BPAI of 2/9/99."  There is no reference to the March 11, 2004 filing of the continuation application submitting the IDS containing the litigation materials.

KEI asserts that the third notice of approval, issued after the examiner had received notice of the litigation and information about the litigation, shows that the examiner did not consider the information material, as a matter of law.  Trinity asserts that the timing of the disclosures—after notices of allowance had issued—precludes any such inference.  Trinity accuses KEI of manipulating the process to delay disclosing information about the litigation until after the examiner had "committed himself" to allowing the '755 Application claims.

In the posttrial briefs and other submissions, Trinity identifies certain information from this litigation that it asserts was material and should have been disclosed.  The first is the existence of the litigation itself.  Other specific matters Trinity argues that KEI should have disclosed are that: (1) the source of the additional prior art disclosed in  the '820 Patent Application prosecution was this infringement lawsuit; (2) Sicking testified in the preliminary injunction hearing that KEI filed an amendment in the '820 Patent Application

claims to delete the "cutting means" and "terminal" limitations in part based on Trinity's arguments in the litigation that these limitations meant that the MPS-350 and TRACC did not infringe; (3) Bronstad's testimony that the Gertz '484 Patent anticipated the '003 Patent; (4) Trinity's allegations of invalidity and inequitable conduct based on the Gertz '484 prior art reference; and (5) this court's ruling denying KEI's motion for a preliminary injunction based on alleged infringement of '003 Patent.

### 3.   The Alleged Failure to Disclose the Existence of This Litigation During the '820 Patent Prosecution

This court finds credible the testimony of Erlich and Rogers that oral notice was given to the patent examiner of the existence of this litigation sometime in the fall of 2001, after Trinity had made filings in this litigation asserting invalidity based on the Muspratt, Rands, and Armstrong prior art patents.  Admittedly, the notice was not in the written form required for communications with the PTO.  Nor did the notice include information as to the specific allegations of infringement or the defenses and counterclaims Trinity asserted.  Instead, Erlich told the examiner that he would be filing additional prior art and a continuation application to have all the '820 Application claims reexamined in light of the prior art.  Erlich told the examiner that the prior art had been disclosed in litigation involving the parent to the divisional '820 Patent Application.  No further details about, or information from, the litigation was disclosed.  But the credible testimony and evidence leads this court to find that within two months of the filing of the lawsuit, and shortly after present counsel (prosecution and litigation) became involved, the lawyer primarily responsible for the '820 Patent prosecution told the patent examiner of the existence of the '003 Patent infringement

litigation, and the lawyer primarily responsible for coordinating the litigation and prosecution checked to be sure that had been done.

Trinity argues that Rogers and Erlich are not to be believed because neither specifically recalled the provisions of MPEP § 2001.06(c) nor found it, or the few cases applying it, during the research they did.  The Federal Circuit has noted that the MPEP is well known among patent lawyers. *Critikon*, 120 F.3d. at 1256.  That is not the same as saying that every provision of the MPEP is well known.  Both Rogers and Erlich, recognized as capable and experienced patent lawyers, testified that they were aware of their duty to disclose material information.  It is clear that neither did a thorough or disciplined job of researching the rules or case law to obtain guidance on the usual circumstance of a simultaneously-pending infringement suit involving a parent patent and prosecution of a divisional application.  Their research does not, however, make their testimony incredible or support a finding of intent to deceive.  Erlich was focused on the claim language and the disclosure of prior art.  Rogers was focused on avoiding inconsistent positions in the '003 Patent litigation and the '820 Application prosecution.  Neither was  focused on the legal research into the specific disclosure that might be required in the unusual factual circumstance they faced.  But both credibly testified that they wanted to be sure the patent examiner understood why, after allowing two claims, he was being asked to reexamine all the claims in light of previously-undisclosed prior art references.  And both credibly testified that they were focused on what information was material to the patentability of the '820 Application and had to be disclosed.

Erlich's testimony that he gave oral, telephonic notice of the existence of this litigation to the examiner is credible. It is supported by the unusual nature of the request Erlich was intending to make and Erlich's desire for the examiner to understand what led to the request for additional examination of previously-allowed claims and the disclosure of additional prior art disclosures. Rogers also credibly testified that he checked to make sure the disclosure had been made.

The fact that Erlich made an informal and oral, rather than a formal and documented, disclosure of the existence of the litigation is not a basis for finding a breach of the duty to disclose material information with an intent to deceive that would support a finding of inequitable conduct. The rules provide that "[a]ll business with the Patent and Trademark Office should be transacted in writing. . . . The action of the [PTO] will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt." 37 C.F.R. 1.2. However, the cases in which a failure to disclose litigation during a pending patent prosecution led to an inequitable conduct finding involved a failure to make any disclosure, written or oral. *See, e.g.*, *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997); *DaimlerChrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054, 1064 (S.D. Cal. 2003); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.*, 837 F. Supp. 1444, 1477 (N.D. Ind. 1992). In one of the few cases involving an oral, as opposed to a written, disclosure, the court emphasized that "a finding of inequitable conduct is too grave a finding to be based upon a distinction between whether a

disclosure was made orally or in writing—the question is whether a disclosure was made at all." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 68 F. Supp.2d 508, 549 (D.N.J. 1999).

Trinity argues that in December 2001, when KEI disclosed the prior art that was cited in Trinity's motion for summary judgment based on invalidity in October 2001, KEI should have contemporaneously disclosed that the prior art had been revealed in this lawsuit and asserted to invalidate the parent '003 Patent. This court has credited testimony that Erlich, the lawyer prosecuting the '820 Patent application for KEI, had told the examiner of the link between the lawsuit and the additional prior art that was being disclosed. The more important issue is whether more information about Trinity's arguments as to how that prior art invalidated the '003 Patent should have been provided.

While it is clear that Rule 56 is not limited to prior art references, *Critikon, Inc*., 120 F.3d at 1258,  KEI's failure to disclose Trinity's legal arguments as to why the prior art anticipated the '003 Patent did not violate its duty of candor. Trinity's legal arguments for anticipation based on the prior art references—as opposed to the prior art references—did not by themselves or in combination with other information establish a *prima facie* case of unpatentability of the '820 Patent Application. The cases analyzing materiality in this context focus on factual information or legal conclusions that emerge from a lawsuit related to a patent being prosecuted, not on the opposing party's legal arguments about the significance of prior art or other aspects of litigation. *See Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 676–77 (D. Del. 2004); *Environ Prods., Inc. v. Total*

*Containment, Inc.*, 951 F. Supp. 57, 61 (E.D. Pa. 1996); *Haney v. Timesavers, Inc.*, 900 F. Supp. 1378, 1381–82 (D. Or. 1995).

This court finds that KEI did make a disclosure of the existence of the litigation in the fall of 2001, during the prosecution of the '820 Patent Application, and that material information about the litigation was not withheld when KEI disclosed the prior art references in December 2001. In September 2002, when KEI filed the '755 Application, however, it again failed to disclose the existence of the lawsuit. This failure to provide either oral or written notice is troubling. Written notice of the litigation was not provided until June 2003, four months after Trinity had filed an answer and counterclaim alleging a failure to disclose litigation information to the patent examiner during the prosecution of the '820 Patent and quoting MPEP § 2001.06(c). KEI delayed in providing information of the existence of the lawsuit to the examiner, even after it had added the '820 Patent infringement allegations to the suit. This delay in providing litigation information during the '755 Application prosecution, however, is not clear and convincing evidence of an intent to deceive the patent examiner in the manner and timing of disclosing litigation information during the '820 Patent Application prosecution. Whether KEI engaged in inequitable conduct in failing promptly or more thoroughly to disclose litigation information to the examiner considering the '755 Application is not before this court.

4. *The Failure to Disclose the Litigation as the Source of the December 11, 2001 Amendments to the '820 Patent Application Claims*

Trinity also argues that when KEI amended the '820 Patent Application claims to remove the "terminal" limitation and to change the "cutting means" limitation to "cutter,"

KEI should have told the PTO that it made the changes in part based on Trinity's litigation arguments.  Trinity had argued that these limitations meant that its devices did not infringe the '003 Patent.  KEI responds that a patent applicant's subjective reasons for amending claims are not "material" when the reasons do not themselves bear on patentability.  Rather, the patentability issues as to the '820 Patent Application were whether the claims, as amended, were patentable over prior art, whether the amended divisional application claims met the written description requirement, and whether the amended divisional application claims were within the subject matter disclosed in the parent application.  An applicant is entitled to claim the benefit of the filing date of the parent application for continuation and divisional applications only to the extent that the parent application discloses the subject matter claimed in the subsequent application.  *Chiron Corp. v. Genentech, Inc.*, 363 F.3d. 1247, 1253 (Fed. Cir. 2004); 35 U.S.C. §§ 120, 121.  Divisional applications must comply with the written description requirement as well as with the restriction on new matter. *See Transco Prods. Inc. v. Performance Contracting, Inc*., 38 F.3d 551, 555 (Fed. Cir. 1994) ("A divisional application . . . [is] carved out of an earlier application . . . . [It] claims only one or more, but not all, of the independent inventions of the earlier application.").

Trinity appears to argue that any time an applicant uses information learned in litigation involving a parent patent to amend a claim in a divisional or continuation patent application, the source of the information is material as a matter of law and must be disclosed.  Perhaps that would be a salutary rule that should be adopted.  But such a broad rule does not appear to be based in the Rule 56 definition of "materiality."  When KEI

amended claims in the '820 Patent Application to remove limitations that were present in the

'003 Patent claims, that was not inconsistent with positions taken or statements made in the

'003 Patent lawsuit.  KEI's litigation arguments on the relationship between the '003 Patent

claims and Trinity's MPS-350 and TRACC were not inconsistent with its arguments to the

examiner considering the '820 Patent Application that removing those limitations broadened

the claims yet met the requirements of patentability.  Trinity does not identify how the

information as to why KEI wanted to amend the claims to remove these limitations "by itself

or in combination with other information, [established] a prima facie case of unpatentability"

of the amended claims.  37 C.F.R. § 1.56(b)(1).  Trinity does not articulate how KEI's

reasons for wanting to broaden the claims—in this case, to enhance its ability to capture

Trinity's MPS-350 and TRACC devices based on information learned from Trinity in

litigation—bears on the patentability of the broadened claims.  Trinity instead appears to

argue that such conduct is inequitable unless it is disclosed, and therefore it must be

disclosed.  This tautological statement is not a basis for finding either a failure to reveal

material information or an intent to deceive the patent examiner.

When KEI amended the claims in the '820 Patent Application to remove limitations

that had been in the '003 Patent claims, that affected the relationship between the issues

before the examiner and the issues before the court.  In  the '003 Patent litigation, this court

focused on the effect of the limitations in the claim terms on the infringement contentions.

In the '820 Patent Application, the removal of those limitations from the amended claims

meant that the examiner was not considering the same claim terms that were the subject of

this court's examination.  When courts have found a breach of the duty to disclose material information from litigation, the relationship between the claim terms considered by the examiner and the claim terms at issue in the litigation has been close.  In *Mallinckrodt*, 2005 WL 2139867, for example, the Federal Circuit emphasized that simultaneously-pending litigation over one patent for pulse oximetry (a device to measure the level of oxygen saturation in a patient's arterial blood) and the prosecution of another patent application by the same inventor were so closely related that the litigation "directly affected the patentability of the invention claimed" in the  patent being prosecuted.  The two patents not only shared a specification; the "same limitations in dispute in the [] litigation were in dispute before the PTO during the prosecution" of the patent.  The applicant was simultaneously litigating the meaning of a certain limitation in the patent claim—"adaptive filter"—and pursuing an amendment to add that limitation to the patent being prosecuted.  In a *Markman* order, the court had decided that the limitation was only an "adaptive noise canceler."  The applicant did not disclose the court's ruling on that issue to the patent examiner, even though the same terms were in dispute in both proceedings and the applicant knew that the examiner was concerned that the specification supported only "adaptive noise canceler" and not "adaptive filter."  2005 WL 2139867, at *21.

    In the present case, by contrast, although the '003 Patent and the '820 Patent Applications share the same specification, in the preliminary injunction hearing, this court was considering claims in the '003 Patent with limitations that the applicant had deleted from the '820 Application.  By contrast, after the '820 Patent issued and was added to this suit, this

court was construing claims in that patent that KEI was simultaneously pursuing in the '755 Application, with the same limitations.  The  claim construction order this court issued involving the '820 Patent directly pertained to the patentability of the '755 Application.  As Rogers testified during the bench trial, when KEI amended the '755 Application claims in October 2003 in reaction to this court's *Markman* order, the '755 Application was then very similar to a reissue application and reexamination.  "You're going into the patent office with the same exact claim that's been issued and you're putting in a parenthetical to modify the interpretation on the claim. . . . [T]he ['820 Patent] application is distinct.  It is not the same claim that was interpreted in the preliminary injunction.  That was claim 6 of the '003."  (*Id.*, p. 407, ll. 11–17).

KEI, like the applicant in *Mallinckrodt*, pursued an amendment to the claim in the '755 Application in order to change the meaning of a term the court had construed in the '820 Patent claims.  Unlike the applicant in *Mallinckrodt*, however, KEI did disclose the fact of the court's claim construction ruling and told the examiner that it was pursuing an amendment in order to change the result of the court's ruling on the meaning of the claim language.

By contrast, the '003 Patent litigation preliminary injunction application and the '820 Patent Application prosecution did not involve the same claim terms.  Deleting limitations from the '820 Patent Application claims meant that the court considering the '003 Patent claim terms and the examiner considering the '820 Patent Application claim terms were presented with different questions.  The difference between the claims at issue in the '003

Patent litigation and the amended claims at issue in the '820 Patent Application prosecution made KEI's reasons for seeking the amendment less, not more, material. *See Mallinckrodt, Inc. v. Masimo Corp.*, No. 04-1495, 147 Fed. Appx. 158 (Fed. Cir. Sept. 7, 2005) (unpublished opinion) (patent holder committed inequitable conduct by arguing before PTO for broad construction of the term "adaptive filter" while failing to disclose that the same term had been narrowly construed by a district court in litigation about a related patent); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (concluding, in examining identical specifications in three related patents, that "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application"); *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) (holding that prosecution history relating to term "admixture" in first patent was important in application for subsequent patent).

KEI cites *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867 (Fed. Cir. 1988), for its clear statement that "there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application.  Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant and cannot of itself evidence deceitful intent."  863 F.2d at 872.  Trinity correctly points out that *Kingsdown* does not address, much less sanction, the

mining of litigation for information about how a competitor distinguishes its product from the applicant's parent patent. To the contrary, *Kingsdown* merely states that if a patent applicant discovers a competitor's product in the marketplace after filing the application, there is no impropriety in amending the claims based on that discovery. More to the present point, however, *Kingsdown* does not state that it is necessary to explain to the examiner the circumstances of the discovery in the marketplace or other reason for amending claims in a patent application. The disclosure issues in that case focused on the applicant's incorrect identification of how the claims in the continuation application corresponded to the claims originally included in the parent application, not the reasons for filing a continuation application or amending the claims in that application.[13] The "source" of, or reason for, the amendment is termed "irrelevant" to patentability. *Id.* at 872.

Trinity's argument that KEI delayed the prosecution of the '820 Patent to learn from Trinity how to achieve the broadened claims it included in the '820 Application does bear on the issue of prosecution laches. That issue is analyzed below. But that issue is separate from the disclosure obligation that is the basis of Trinity's inequitable conduct claim. This court does not find a failure to disclose material information or an intent to deceive in KEI's failure to inform the examiner that the reason it amended the claim terms in December 2001 was in part based on information obtained from Trinity's legal filings in the '003 Patent

---

[13] The applicant listed a claim in the continuation application as corresponding to a claim from the parent application that the PTO had previously rejected for indefiniteness, rather than a claim that had been previously allowed. The PTO did not notice this error. Eventually, a patent issued as a result of the continuation application and the patentee sued the competitor for infringement. The Federal Circuit held that even gross negligence on the part of the applicant could not of itself justify an inference of an intent to deceive.

infringement suit.

>    5.    *The Failure to Disclose Testimony from the Preliminary Injunction Hearing*

In response to KEI's motion for a preliminary injunction in the '003 Patent lawsuit, Trinity alleged inequitable conduct based on the applicant's failure to disclose the Gertz '484 reference in the prosecution of the '003 Patent.  Trinity alleges inequitable conduct in KEI's failure to disclose this inequitable conduct allegation to the examiner in the prosecution of the '820 Patent Application.  Trinity also alleges inequitable conduct in KEI's failure to provide the patent examiner with the testimony  Bronstad and Sicking gave in the preliminary injunction hearing held in April 2002.

During the preliminary injunction hearing, Trinity presented evidence on the Gertz '484 Patent.  Bronstad testified that the Gertz '484 Patent potentially made claim 6 of the '003 Patent invalid.  At the preliminary injunction hearing, KEI responded with two arguments as to why the Gertz '484 was not material prior art.  First, the device disclosed in the Gertz' 484 Patent was a substantially different structure from the technology disclosed in the '003 Patent.  Second, the Gertz '484 Patent was cumulative and effectively before the PTO during the prosecution of the '003 Patent because the examiner cited to two other prior art references by Gertz and those patents both refer to Gertz '484.

Bronstad's testimony that he believed the Gertz '484 Patent anticipated claim 6 of the '003 Patent does not fall within the Rule 56 categories of "materiality."  Trinity took the position at the bench trial that Bronstad's testimony in the preliminary injunction hearing refuted and was inconsistent with KEI's arguments before the examiner that the '820

Application claims were novel as compared to the Gertz '484 prior art patent. The problem with Trinity's argument is that KEI did disclose the Gertz '484 Patent during the prosecution of the '820 Patent Application as prior art. Trinity does not explain how Bronstad's opinion about whether the prior art reference anticipated the parent patent is "material" to the '820 Patent Application under Rule 56. The record shows that Bronstad's testimony was cumulative to the disclosure of the prior art patent itself. *See Environ*, 951 F. Supp. at 61–62 (noting that courts generally limit their requirements for disclosure from prior litigation to issues dealing with factual matters "such as prior art, publications, test results, and devices"). In addition, the fact that the examiner approved the issuance of the '820 Patent over the Gertz '484 reference supports the conclusion that opinions as to the scope of the '484 reference were not material to patentability. *Torpham, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1329–30 (Fed. Cir. 2003) (court evaluating validity of a claim against prior art, after claim has been validated by PTO, must "take into account the statutory presumption of patent validity").

Sicking testified in the preliminary injunction hearing on KEI's behalf. Trinity asserts that KEI engaged in inequitable conduct in failing to disclose Sicking's testimony to the examiner during the '820 Patent prosecution. Trinity argues that Sicking's testimony during the April 2002 preliminary injunction hearing, in which he explained that the "cutting means" limitation in the '003 Patent covered the TRACC's blunt, rounded cutter plate, should have been disclosed to the PTO. Trinity argues that because KEI asserted that the Bronstad prior art reference, which also has blunt, rounded surfaces, did not "cut," the

positions were inconsistent and therefore material to patentability.

A review of Sicking's testimony about the "cutting means" limitation and its relationship to the TRACC during the preliminary injunction hearing in the '003 Patent infringement lawsuit does not show that it was inconsistent with KEI's arguments on patentability in the '820 Patent Application prosecution, so as to be material. Sicking's emphasis in the preliminary injunction hearing was on the relationship of the angled cutter plate in the TRACC device to the cutting means claimed in the '003 Patent. Sicking did not testify that because the TRACC is blunt and rounded, it "cuts" in a fashion similar to the '003 Patent "cutting means." The testimony was not inconsistent with that taken in the '820 Patent Application prosecution that the Bronstad prior art reference claimed a device that shredded, as opposed to sheared, the metal separating the guardrail slots.

Trinity also asserts that KEI engaged in inequitable conduct when it failed to inform the Patent Office during the '820 Patent Application prosecution of Trinity's inequitable conduct accusation. Trinity alleged that during the '003 Patent prosecution, KEI failed to disclose the Gertz '484 Patent. KEI asserts that this litigation information was not material to the examiner considering the '820 Patent Application because in an application for a divisional or continuation application—as opposed to a reissue or reexamination application—the PTO does not investigate or decide allegations of inequitable conduct or violations of the duty of disclosure. 37 C.F.R. § 1291(b); MPEP § 1901.06. The patent rules provide that allegations of inequitable conduct that are made during a divisional or continuation patent application are "entered into the file, generally without comment." *Id.*

But the rules also provide that "no patent will be granted on an application in connection with which fraud on the [PTO] was practiced or attempted or the duty of disclosure was violated through intentional misconduct."  37 C.F.R. § 1.56(a).  And the MPEP gives as specific examples of "material" litigation materials "allegations of 'fraud,' 'inequitable conduct,' and 'violation of the duty of disclosure.'"  MPEP 2001.06(c).

If allegations of inequitable conduct based on a failure to disclose material information in a parent patent prosecution are not considered by a patent examiner considering a divisional application, can the allegations be material to patentability?  KEI urges that the answer must be "no."  This court agrees that in this case, the allegation of inequitable conduct based on the failure to disclose a particular prior art patent during the prosecution of the parent patent was not material and that withholding it did not arise from an intent to deceive the patent examiner.  The record shows that the prior art reference, the Gertz '484 Patent, was disclosed during the prosecution of the '820 Patent and the examiner allowed the claims of the '820 Patent over that prior art reference.  The record also shows that during the '003 Patent Application prosecution, the applicant had disclosed prior art patents that in turn referenced the Gertz '484 Patent.  The record does not show that, as Trinity claims, KEI had an obligation during the '820 Patent prosecution to disclose not only the prior art reference that Trinity alleged KEI had failed to disclose in the '003 Patent prosecution, but also Trinity's allegation that KEI's earlier failure to disclose constituted inequitable conduct in the '003 Patent prosecution.  Nor does that record show that when KEI disclosed the prior art patent in the '820 Patent prosecution but not the allegation that its

failure to do so earlier was inequitable conduct in the '003 Patent prosecution, it intended to deceive the patent examiner.  Intent to deceive by withholding information is particularly difficult to establish when, as here, the patent examiner would not have considered the information had it been provided.  The record does not show clear and convincing evidence of inequitable conduct in the '820 Patent prosecution based on KEI's failure to disclose Trinity's allegations of inequitable conduct in the '003 Patent prosecution made during the '003 Patent infringement lawsuit.

6.      *KEI's Failure to Disclose the Results of this Court's Preliminary Injunction Hearing*

Trinity also argues that KEI breached its duty of disclosure when it failed to inform the PTO that this court had denied the preliminary injunction it sought.  The preliminary injunction order issued in September 2002.  This court ruled that KEI had failed to meet its burden of showing that Trinity's accused products met the "terminal" limitation and the "cutting means" limitation required by the asserted claims of the '003 Patent.  The order, while detailed, focused on infringement, not validity or other patentability issues.  The asserted claims of the '003 Patent that were the subject of the court's analysis contained limitations that had been removed from the claims of the '820 Patent Application.  There is not clear and convincing evidence that the failure to disclose the court's September 2002 order denying KEI's application for a preliminary injunction was a failure to disclose material information or that it was done with an intent to deceive.

7.      *The Disclosures During the '755 Application Prosecution*

KEI argues that the patent examiner's decision to allow the claims of the '755

Application after the existence of the litigation had been disclosed and after boxes of material from the litigation had been submitted means that, as a matter of law, the examiner did not find the litigation or its materials material.  The timing of the disclosures in relationship to the notices of allowance in the '755 Application do not support an inference as to materiality.[14]

The applicant disclosed the existence of this litigation in writing on June 5, 2003.  The PTO issued a Notice of Allowance for claims 1–23 of the '755 Application on July 18, 2003.  On October 20, 2003, the applicant filed a Request for Continued Examination to add new claims and "to re-submit the allowed claims 1–23 for the Examiner to review in light of the information submitted in the Information Disclosure Statement to be filed within a short time."  KEI paid the issue fee on December 14, 2003.  Rogers testified that he sent the documents referenced in the October 21, 2003 IDS on December 24, 2003, but the documents were lost.  In February 24, 2004, the examiner issued the second notice of allowance, without any litigation materials on file.

In March 2004, KEI resubmitted the boxes of litigation materials in an IDS and filed a continuation application, but did not file any amendments to any of the claims.  On December 8, 2004, the PTO mailed a Notice of Allowance on claims 1–39 and attached a Statement of Reasons For Allowance dated November 8, 2004.  The examiner cited the prior art of record, the Board of Appeals February 9, 1999 allowance of the '003 Patent

---

[14]  KEI noted the difficulty an examiner has in reviewing materials after a notice of allowance has issued in arguing that it had no obligation to inform the examiner of the court's preliminary injunction order because that order did not issue until after the examiner had issued a notice of allowance in the '820 Patent prosecution.  (Docket Entry No. 240, p. 20).

Application, the "RCE of 10/21/04 [sic, 10/21/03]" and the terminal disclaimer filed on June 27, 2003.  There is no citation to the IDS containing any of the litigation materials.

The PTO did not have any written material from this litigation other than the description of the *Markman* order filed with the amendments to the claims in October 2003 before issuing the second notice of allowance in February 2004.  No claim amendments were filed when the applicant filed the IDS with the litigation materials and a request for continued examination in March 2004. Given the absence of any amended claim language, it is unclear what the continued examination the applicant requested involved.  The examiner's initials appear on the pages of the IDS containing descriptions of the litigation materials.  Those materials were not submitted until after the second notice of allowance issued.  The absence of any changes to the claims after that second notice of allowance and the absence of any reference in the third notice of allowance issued in December 2004 to the RCE filed in March 2004, leads this court to conclude that the fact that the examiner had the litigation materials in his possession before issuing the third notice of allowance does not support any inference as to the materiality of those materials.  There is no basis to presume that the examiner considered the litigation materials—other than the spare description of the *Markman* order—in deciding whether the '755 Application claims were supported by the specification, were supported by the parent application disclosures, or otherwise met the requirements for patentability.  *Chiron*, 363 F.3d. at 1253; 35 U.S.C. §§ 120, 121.

### 8.    *Conclusion as to Equitable Conduct*

Based on the credited testimony of Sicking, Rogers, and Ehrlich, and on the record

of what KEI disclosed to the examiner and the relationship of the litigation to the claims in the patents in prosecution, this court does not find clear and convincing evidence of inequitable conduct, as Trinity alleges.

### E.       Prosecution Laches

#### 1.      *The Legal Standard*

Trinity asserts that KEI and its predecessors unreasonably delayed in prosecuting the '820 Patent, making it unenforceable.  In *Symbol Technologies, Inc. v. Lemelson Medical*, the Federal Circuit held that "the equitable doctrine of laches may be applied to bar enforcement of patent claims that issued after an unreasonable and unexplained delay in prosecution even though the applicant complied with pertinent statutes and rules." 277 F.3d 1361 (Fed. Cir. 2002).  In *Symbol*, the district court had granted the patentee's motion to dismiss the defendant's prosecution laches defense under Rule 12(b)(6). The Federal Circuit reversed the dismissal on the basis of Supreme Court precedent that "ratified prosecution laches as a defense to an infringement action involving new claims issuing from divisional and continuing applications that prejudice intervening adverse public rights." *Id.* at 1364 (citing *Crown Cork & Seal Co. v. Ferdinand Gutmann Co.*, 304 U.S. 159 (1938); *Webster v. Elec. C. v. Splitdorf Elec. Co.*, 264 U.S. 463 (1924); *Woodbridge v. United States*, 263 U.S. 50 (1923)).  The court did not address the standard of proof or type of evidence necessary to prove the defense and did not adopt any presumptions for unreasonable delay. *Compare A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992); *A & E Prods. Group, L.P. v. Mainetti USA Inc.*, No. 01-10820, 2004 WL 345841

(S.D.N.Y Feb. 24, 2004) (discussing treatment of the defense by district courts); *Digital Control Inc. v. McLaughlin Mfg. Co. Inc.*, 248 F. Supp. 2d 1015 (W.D. Wash. 2003) (discussing the limited precedent for the recently "revived laches defense"); *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1139, 1143 (E.D. Cal. 2002).

In *Symbol Techs., Inc. v. Lemelson Medical, Education & Research Foundation, LP*, No. 04-1451, 2005 WL 2173572 (Fed. Cir. Sept. 9, 2005) (*Symbol II)*, the Federal Circuit affirmed the district court's finding of prosecution laches. In that case, the patents at issue had remained pending for periods of between 18 to 39 years. The court emphasized that the doctrine of prosecution laches should be used "sparingly" and only in "egregious cases of misuse of the statutory patent system." *Id.* at *6. The issue is whether, as a matter of law, KEI's delay in prosecuting the divisional application was unexplained and unreasonable.

      2.    *Analysis*

The '003 Patent was filed in November 1994. In June 1996, after the examiner had entered a restriction requirement, the applicant asked that the withdrawn claims "remain in the case until the applicant is able to file a divisional application. In 1996, Trinity's MPS-350 was approved by the Federal Highway Administration, and Trinity began to sell the products in September 1996. In November 1998, during the period that the '003 Patent applicant was appealing the examiner's rejection, Trinity's TRACC was approved by the Federal Highway Administration. It was not until February 1999 that the Board of Patent Appeals issued its decision, reversing the examiner in the '003 Patent Application. Later that year, the PTO issued patents directed to the MPS-350 and the TRACC products.

Shortly after these patents issued, in October 1999, the applicant filed the '820 Patent application as a divisional application.  The '003 Patent issued in February 2000.  In August 2001, a year and a half after the '003 Patent issued, KEI filed this suit.  Trinity developed two products during this period—the SHORTRACC and FASTRACC.  During the '003 Patent litigation, KEI filed amendments in the '820 Patent Application prosecution.  The examiner issued a notice of allowance in August 2002.  A month later, KEI filed the '755 Application.  As soon as the PTO issued the '820 Patent in January 2003, KEI amended its complaint to allege that Trinity infringed it as well.

Trinity argues that KEI had no legitimate reason to wait for the examiner to issue the notice of allowance in the application for the '003 Patent before filing the divisional application for the '820 Patent.  Trinity also argues that delays in prosecuting the '820 Patent Application resulted from KEI's scheme to use the litigation to learn about Trinity's devices and broaden the divisional and continuation claims to capture them.

The standard of proof and type of evidence necessary to establish prosecution laches are unclear.  *See Stambler v. RSA Sec., Inc.*, 243 F. Supp. 2d 74, 75 (D. Del. 2003) (lamenting lack of guidance on the legal standards applicable to the prosecution laches defense and granting summary judgment to plaintiff).  The delays in the present case do raise legitimate concerns.  "Where a long period of delay is involved, other inventors may work under the assumption that the patentee is not going to prosecute broader claims; they may develop improvements only to find that they are infringers of a later-prosecuted patent."  *Chiron*, 268 F. Supp. 2d at 1143.  The problem in using prosecution laches in this case, however, is that

although KEI appears to have taken advantage of opportunities that delay provided, much of the delay was due to overcoming the patent examiner's rejections.  Additionally, Trinity's criticisms of the decision to seek a divisional patent in the first place, and to delay applying for that patent until the PTO had issued a notice of allowance in the parent patent application, are inconsistent with the Federal Circuit's statements in *Symbol II*:

> Filing a divisional application in response to a requirement for restriction is one such legitimate reason for refiling a patent application. . . .[I]t cannot, without more, be an abuse of the system to file divisional applications on various aspects that the PTO has considered to be separate and distinct from each other. . . . That is so even when one defers the filing of a divisional application until just before the issuance of the parent application.  Such action is expressly allowed by statute.

2005 WL 2173572, at *6.

Equally troubling for Trinity's arguments is the sparse authority for the relief it seeks. At present, only one district court (now affirmed by the Federal Circuit) has found prosecution laches, and in that case the delays were as long as 39 years.  The courts have expressed concern about finding prosecution laches because it is difficult to determine how much time is an unreasonable amount of time.  In this case, the delays that occurred do not approach the delays found reasonable in many other cases.  *See, e.g.*, *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP*, 301 F. Supp. 2d 1147, 1155–56 (D. Nev. 2004) (holding Lemelson's patents in issue unenforceable for prosecution laches after several decades of delay); *Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1156–59 (N.D. Cal. 2003) (denying summary judgment of laches for delays in prosecution of eleven years); *Cummins-Allison Corp. v. Glory Ltd.*, No. 02-7008, 2003 WL 355470, at *2, *25 (N.D. Ill.

Feb. 12, 2003) (holding that defendant did not prove likelihood of success of prosecution laches claim when delay was more than ten years); *Stambler v. RSA Sec., Inc.*, 243 F. Supp. 2d 74, 74–75 (D. Del. 2003) (seven-year delay between original claim to priority and the issuance of final patent was not unreasonable as a matter of law); *Intuitive Surgical, Inc. v. Computer Motion, Inc.*, No. 01-203, 2002 WL 31833867, at **4–6 (D. Del. Dec. 10, 2002) (finding no laches in delay of almost nine years); *Digital Control, Inc. v. McLaughlin Mfg. Co.*, 225 F. Supp. 2d 1224, 1228 (W.D. Wash. 2002) (granting summary judgment of no laches when delay was more than ten years); *cf. Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1139, 1143–44, 1148 (E.D. Cal. 2002) (refusing summary judgment to patentee on laches when delay of more than fifteen years was unexplained).

This court does not find prosecution laches that would bar enforcement.

## III.   Conclusions of Law

This court does not find inequitable conduct as to the '003 Patent or the '820 Patent. The record does not show clear and convincing evidence of KEI's failure to disclose information about this litigation or from this litigation to the Patent Office that either deprived the Patent Office of material information or was the result of an intent to deceive.

This court does not find prosecution laches that would preclude enforcement.  The record does not show unreasonable and unexplained delays in prosecuting the '003 and '820 Patents.

## IV.     Conclusion

The Federal Circuit has held that it is axiomatic that "[c]lose cases should be resolved by disclosure, not unilaterally by applicant." *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992).  "This sentiment is also repeatedly reflected in the Manual of Patent Examining Procedure (MPEP), which, although it does not have the force of law, is well known to those registered to practice in the PTO and reflects the presumptions under which the PTO operates." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256–58 (Fed. Cir. 1997) (citing *Refac Int'l Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1584 n.2 (Fed. Cir. 1996).  At the same time, the Federal Circuit is concerned about the virtually routine assertion of inequitable conduct in patent cases.  "[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988).  Recognizing that unjustified accusations of inequitable conduct may deprive patentees of earned rights and impugn fellow professionals, the rules properly impose a heavy burden of proof.  Clear and convincing evidence of a failure to disclose is required. The information withheld must be material.  And the applicant must conceal the information intending to deceive the patent office.  The showings necessary, and the level of proof required, lead this court to conclude that KEI did not engage in inequitable conduct in prosecuting the '003 and '820 Patents.

At the same time, however, Trinity is right when it criticizes what KEI did.  KEI obtained a patent in a crowded area of well-established technology.  KEI then filed

infringement litigation against Trinity, accusing products that had been marketed for an extended period.  KEI used the litigation to harvest information about the products and used the information to shape the claims of a divisional application and then a continuation application, in order to enhance the likelihood that it would make Trinity an infringer. *Kingsdown* does not sanction this practice, although it does not forbid it.

Unlike the patentee in *Kingsdown*, KEI did not discover Trinity's products in the marketplace after the issuance of the '003 Patent.  To the contrary, KEI knew of Trinity's products long before the '003 Patent issued and long before the '820 and '755 Applications were filed.  KEI used the infringement suit it filed to learn why Trinity thought its products did not infringe the '003 Patent.  KEI then used that information to broaden the claims of what became the divisional '820 Patent and what will issue from the continuation '755 Application, to "capture" products that KEI had known about all along.  This work was not done by the inventors, who had no involvement in the prosecution of the '820 Patent or the '755 Application.   Instead, the lawyers simultaneously prosecuted the divisional and continuation patent applications and the infringement litigation on the parent patent.  The '820 Patent and the '755 Application have very little to do with invention and much to do with litigation.

The circumstances of this case and the specific facts of this record lead this court to conclude that there was no failure to disclose information that is material under the patent rules, with an intent to deceive the Patent Office.  The problem is not one of inequitable conduct based on a failure to disclose, although that issue is a close one.  The lawyers instead

exploited what the rules apparently permit.  Whether the rules should permit a patentee to

expand claims in such a fashion, substituting litigation for invention, is not a decision for this

court to make.  But the results of those rules, as demonstrated by this case, are disquieting

and raise issues that deserve close examination.

SIGNED on January 13, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge